# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

NEIL B. MOONEY,

      Plaintiff,

vs.

RADIX VENTURES, INC., RADIX
GROUP INTERNATIONAL INC.,
AIR EXPRESS INTERNATIONAL
CORPORATION, AIR EXPRESS
INTERNATIONAL U.S.A. INC.,
and AEI OCEAN SERVICES INC.

      Defendants,

**99 - 959**

CASE NO:      CIV-_____

CIV-UNGARO - BENAGES

MAGISTRATE JUDGE
BROWN

**_COMPLAINT_**

99 APR -2 PM 1:29

The Plaintiff, NEIL B MOONEY, sues the Defendants, RADIX VENTURES INC., RADIX GROUP INTERNATIONAL INC., AIR EXPRESS INTERNATIONAL CORPORATION, AIR EXPRESS INTERNATIONAL U.S.A. INC., INC. and AEI OCEAN SERVICES INC. and states:

### _JURISDICTION_

1.    This is an action for damages in excess of $75, 000, exclusive of interest, costs and attorney fees. Jurisdiction of this Court is based upon 28 U.S.C. § 1332(a)(1) and 1332(c)(1).

2.    As hereinafter alleged, each of the below named Defendants operated, conducted, engaged in or carried on a business or business venture in this judicial district as contemplated by Florida Statute §48.181.  These business activities were substantial and not an isolated activity in this judicial district.  Moreover, the Defendants, RADIX VENTURES INC., RADIX GROUP INTERNATIONAL INC. and AIR EXPRESS INTERNATIONAL CORPORATION, breached a contract in this judicial district by failing to perform acts in Florida as contemplated by Florida Statute §48.193(1)(g).  Finally, the Defendant, AIR EXPRESS INTERNATIONAL CORPORATION, has committed a tortious act within this judicial district as contemplated by Florida Statute 48.193(1)(b).   As a consequence, each of the Defendants is subject to the jurisdiction of this court.

3.    Venue is proper in this judicial district under 28 U.S.C. § 1391(a), as this is the judicial district in which a substantial part of the events or omissions giving to the claim occurred.

## *PARTIES*

4.    The Plaintiff, NEIL B. MOONEY, (hereinafter referred to as "MOONEY") was at all times material hereto a resident of Miami-Dade or Leon Counties, Florida.

5.    RADIX VENTURES, INC., (hereinafter referred to as "RADIX VENTURES") is a Delaware Corporation which, through its wholly owned operating subsidiary, RADIX GROUP INTERNATIONAL, INC., conducted business until July 8, 1995 as an international air freight forwarder, international ocean freight forwarder, non vessel operating common carrier

(

(

(NVOCC), customs broker and warehouse operator under the business name of "RADIX GROUP INTERNATIONAL." RADIX GROUP INTERNATIONAL operated from 22 branches, including its Miami branch office located in Miami-Dade County, Florida.

6.      RADIX GROUP INTERNATIONAL, INC. (hereinafter referred to as "RGI" ) was, at all times material hereto, a California Corporation, wholly owned directly by RADIX VENTURES and authorized to and doing business in Miami-Dade County, Florida as RADIX GROUP INTERNATIONAL.

7.      AIR EXPRESS INTERNATIONAL CORPORATION (hereinafter referred to as "AEI"), is a Delaware Corporation which, through its several direct and indirect subsidiaries, including AIR EXPRESS INTERNATIONAL U.S.A. INC. and AEI OCEAN SERVICES INC., conducts business as an international air freight forwarder, international ocean freight forwarder, NVOCC, customs broker and warehouse operator under the business name of "AIR EXPRESS INTERNATIONAL." AEI was and is headquartered in Darien, Connecticut, from which it directs and controls its national and international operations, including those of its Miami branch office in Miami-Dade County, Florida.

8.      AIR EXPRESS INTERNATIONAL, U.S.A. INC. (hereinafter referred to as "AEI U.S.A.") was, at all times material hereto, a Delaware Corporation, wholly owned directly by AEI and authorized to and doing business in Miami-Dade County, Florida, under the name AIR EXPRESS INTERNATIONAL. AEI U.S.A. is headquartered in Darien, Connecticut and operates AEI's airfreight, ocean freight forwarding, distribution and warehouse services.

9.      AEI OCEAN SERVICES INC., p/k/a Votainer U.S.A. Inc. (hereinafter AEI OCEAN) was, at all times material hereto, a Delaware Corporation, wholly owned directly by AEI and authorized to and doing business in Miami-Dade County, Florida under the name AEI EXPRESS INTERNATIONAL.  AEI OCEAN is headquartered in Darien, Connecticut and operates AEI's NVOCC and import ocean breakbulk services.

### *FACTS GIVING RISE TO CAUSE OF ACTION*

10.      From August 15, 1984 to July 8, 1994 MOONEY, like RADIX VENTURES and AEI, conducted business as an international air freight forwarder, international ocean freight forwarder, NVOCC, customs broker and warehouse operator.  MOONEY conducted his business through three wholly owned Florida Corporations, Flagship Forwarding Corp., Flagship Trades Services, Inc., and Caribe Basin Services, Inc., under the business name "Flagship."  Unlike RADIX VENTURES and AEI, Flagship operated exclusively from an office/warehouse located at 1550 N.W. 96th Avenue, Miami, Florida 33172.  Flagship leased these premises from Flagship Properties, Inc., an entity owned by MOONEY and his wife.

11.      In the Spring of 1994 MOONEY, having received several overtures from RADIX GROUP INTERNATIONAL seeking to acquire Flagship and merge Flagships operations with its Miami branch office, agreed to discuss such an acquisition and  merger.   The parties ultimately agreed to an acquisition of Flagship by RGI effective July 8, 1994 as reflected in the ASSET PURCHASE AND SALE AGREEMENT, CONSULTING AGREEMENT, EMPLOYMENT AGREEMENT, LEASE,  and NON-COMPETITION AGREEMENT

(hereinafter referred to collectively as the RADIX - FLAGSHIP PURCHASE AGREEMENTS) attached hereto as Exhibits A-D.

12.     Matthew Sheppard was the Chief Executive Officer of RGI. It was his expressed representation and belief during negotiations that the successful merger and consolidation of the Miami branch offices of RADIX with Flagship required the continued supervision, management and business development skills of MOONEY, post acquisition. Thus, as partial consideration for the purchase of Flagship by RGI, in addition to certain payments identified as "purchase price for assets," "consultation fees," "non-compete compensation" and "lease payments," RGI agreed to compensate Mooney with salary and commissions until December 31, 1997 while he served as Vice President in charge of the Miami branch office of RADIX GROUP INTERNATIONAL.

13.     The basis for payment of the "commissions" were set forth in paragraph 2(b) of the EMPLOYMENT AGREEMENT.   First, MOONEY was to be paid 25% of the annual contributions of the Miami office of RADIX GROUP INTERNATIONAL in excess of $750,000. The net revenues, upon which the contributions were to be calculated, were not limited in any fashion by the manner in which the revenues were generated.   Second, pursuant to 2(b)(ii), MOONEY was to be paid 5% of all net fees and commissions related to customers introduced to RADIX GROUP INTERNATIONAL by MOONEY and invoiced to any office other than its Miami office.

14.     The obligation to employ MOONEY as Vice President of the Miami office of

RADIX GROUP INTERNATIONAL and pay the commissions as set forth in the EMPLOYMENT AGREEMENT, were binding on the successors of RGI. The performance of RGI was guaranteed by RADIX VENTURES.

15.     The commissions, which were premised upon the representations by RGI that MOONEY would be in charge of its, or its successors, Miami branch office through December 31, 1997, were material to MOONEY's decision to sell Flagship to RGI.

16.     The effective date of the RADIX - FLAGSHIP PURCHASE AGREEMENTS was July 8, 1994. Thereafter, MOONEY oversaw the successful merger of the two Miami offices and otherwise complied with all the terms and conditions as set forth in his EMPLOYMENT AGREEMENT with RGI. In 1995, at the direction of RGI, the geographical area of responsibility of the Miami branch office of RADIX GROUP INTERNATIONAL was expanded to include Central Florida. As a consequence, MOONEY hired additional personnel and otherwise increased the overhead of the Miami office to service this new territory.

17.     On May 3, 1995, less than one year after RGI acquired Flagship, RADIX VENTURES and AEI entered into an AGREEMENT AND PLAN OF REORGANIZATION (hereinafter the RADIX/AEI MERGER AGREEMENT) effectuated by a stock exchange and merger of RADIX VENTURES with AEI's newly created and wholly owned subsidiary AEIC Acquisition Corporation. This new entity assumed all the liabilities and obligations of RADIX VENTURES and, although now itself a wholly owned subsidiary of AEI, continued to utilize the corporate name RADIX VENTURES, INC.

18.     The effective date for the merger of RADIX VENTURES with AEI was June 8, 1995.  Thereafter, AEI also continued to utilize the corporate structure of RGI, although, as set forth below, its operational functions were limited by AEI to only the customs brokerage business, henceforth RGI conducted business as AEI Customs Brokerage Services.

19.     Prior to May 3, 1995, the effective date of the RADIX/AEI MERGER AGREEMENT, RADIX VENTURES disclosed to AEI the EMPLOYMENT AGREEMENT between RGI and MOONEY, the performance of which RADIX VENTURES had guaranteed.

20.     After May 3, 1995, but prior to June 8, 1995, MOONEY was advised of the planned merger of RADIX VENTURES with AEI and that he was to henceforth consider himself an employee of AEI.  The Miami branch office of RADIX GROUP INTERNATIONAL was directed to henceforth refuse delivery of and divert all new airfreight shipments to the Miami branch  office of AIR EXPRESS INTERNATIONAL.  It was also instructed to handle and store goods in the control of  AIR EXPRESS INTERNATIONAL without charge to any party.

21.     Thereafter, AEI, began to direct and cause the merger of the Miami, Orlando and Tampa operations of the Miami branch office of RADIX GROUP INTERNATIONAL, including its personnel, cargo, foreign agencies, clientele, automated information systems, assets etc. with those of the Miami branch and Central Florida branch offices of AIR EXPRESS INTERNATIONAL.

22.     On or about August 5, 1995 AEI, having begun the stripping of  assets and

accounts from RGI, save for Customs Brokerage, proposed that MOONEY accept a position as

its Director of Business Development For Central America and Caribbean, reporting to the Vice

President of the Miami branch office of AIR EXPRESS INTERNATIONAL.  This position was

materially different in status, duties and compensation  than that described in the Employment

Contract.

23.    MOONEY declined AEI's offer and advised AEI of his entitlement and desire to

continue in that position described and contemplated by the Employment Contract, or its

equivalent, i.e. Vice President of the Miami branch office of the successor in interest of RGI,

AIR EXPRESS INTERNATIONAL.   In response, AEI notified MOONEY that his only

function would be to terminate his relationship with AEI and it's subsidiaries, including RGI.

He was later instructed to remove  himself from the premises of AIR EXPRESS

INTERNATIONAL, including its Miami branch office, and refrain from all contact with any of

its existing or prospective staff or clients.

24.    Thereafter, as part of the complete merger of RADIX GROUP

INTERNATIONAL operations with those of AIR EXPRESS INTERNATIONAL, AEI

completed the physical and operational merger of the Miami branch office of RADIX GROUP

INTERNATIONAL with the Miami and Central Florida branch offices of  AIR EXPRESS

INTERNATIONAL. When completed, all personnel, foreign agents, cargo, assets and accounts

of the Miami branch office of RADIX GROUP INTERNATIONAL, save for those functions

related to Customs Brokerage, were stripped and diverted to the Miami and central Florida

branch offices of AIR EXPRESS INTERNATIONAL, without equivalent consideration to RGI

or RADIX VENTURES, and for the sole use and benefit of AEI's wholly owned subsidiaries,

AEI U.S.A. and AEI OCEAN.

25.     After the merger of RADIX VENTURES with AEI was completed, all operations,

including those previously performed by RGI, were directed and controlled by AEI from its

headquarters in Darien, Connecticut.   Guenter Rohrman, AEI's chief executive officer,

appointed himself president of  RGI and moved its principal place of business to AEI's

headquarters in Darien, Connecticut.

26.     After MOONEY was told by AEI to cease and desist from any activities on its

behalf, AEI directed RGI, whose only operational function for AEI was now Customs

Brokerage, to  maintain MOONEY on its books as its employee.   The purpose of this thinly

veiled sham was to promote the fiction that MOONEY's entitlement to commissions was limited

to the net revenues generated only from Customs Brokerage of the Miami office of RGI.

Although MOONEY's annual salary payments were made by RGI, AEI made all other payments

required by the RADIX - FLAGSHIP PURCHASE AGREEMENTS, including consulting fees,

non-compete fees and lease payments. In addition, MOONEY was included in AEI's health and

401(k) plans.   In all regards, AEI exercised the sole and ultimate authority and control to

determine MOONEY's employment activities as well as his entitlement to, accounting for and

payment of commissions as described in the EMPLOYMENT AGREEMENT.

27.     From May 3, 1995 to December 31, 1997 MOONEY, was not permitted by AEI

*Mooney v. Radix, etc., et al.*
Page -10-

or RADIX VENTURES or RGI to function as Vice President in charge of the Miami branch office of AIR EXPRESS INTERNATIONAL, the successor in interest to RADIX GROUP INTERNATIONAL, or in any other capacity consistent with the duties and compensation described in the EMPLOYMENT AGREEMENT. Likewise, AEI converted the commissions owed to MOONEY for its own use and benefit.

28.     Despite MOONEY's requests for an annual accounting as required by Paragraphs 2(b)(I) and 2(b)(ii) of his EMPLOYMENT AGREEMENT and payment of commissions consistent therewith, neither AEI, RADIX VENTURES or RGI provided MOONEY with the required information or compensation.

29.     MOONEY has retained Charles A. Curran, P.A. as its counsel in this action and has agreed to pay them reasonable attorneys' fees for services rendered to MOONEY herein.

## *COUNT I*
## *BREACH OF FIDUCIARY DUTY AND ACCOUNTING AGAINST RGI, RADIX VENTURES, AEI, AEI U.S.A. AND AEI OCEAN*

30.     MOONEY adopts and realleges paragraphs numbered 1-29 as if fully set forth herein.

31.     The commissions payable to MOONEY pursuant to paragraphs 2(b)(I) of the EMPLOYMENT AGREEMENT were a material consideration to MOONEY's decision to sell Flagship to RADIX GROUP under the terms and conditions set forth in the RADIX - FLAGSHIP PURCHASE AGREEMENTS.

32.     The commissions described in paragraphs 2(b)(I) of the EMPLOYMENT

(                                    (

*Mooney v. Radix, etc., et al.*
Page -11-

AGREEMENT entitle MOONEY to share, through December 31, 1997, in the profits of the

Miami branch office of RADIX GROUP INTERNATIONAL, or its successors.  However,

should the net revenues be insufficient to generate commissions, MOONEY would suffer loss

by virtue of the reduced consideration he would receive for the sale of Flagship to RGI and his

wasted efforts.  As a result, MOONEY was a joint adventurer with RGI (or its successors) as

regards the financial success or failure of the Miami branch office.  As a consequence, RGI (and

its successors ), owed to MOONEY a fiduciary duty.

33.     RADIX VENTURES unconditionally and irrevocably guaranteed the compliance

of RGI with its obligations as set forth in the EMPLOYMENT AGREEMENT.

34.     By virtue of AEI's merger with RADIX VENTURES and RADIX GROUP, and

by virtue of the actions taken by AEI in stripping the assets of RGI for AEI's own benefit, and

that of its wholly owned subsidiaries, AEI U.S.A and AEI OCEAN, without equivalent

consideration, AEI, AEI U.S.A. and AEI OCEAN became successors in interest to the RGI.  As

such, they each owed to MOONEY a fiduciary duty as regards the  operation of the Miami and

Central Florida offices of AIR EXPRESS INTERNATIONAL.

35.     RGI, RADIX VENTURES, AEI, AEI U.S.A. and AEI OCEAN breached their

fiduciary duties to  MOONEY by denying him the opportunity to function as Vice President of

the Miami branch office of  AIR EXPRESS INTERNATIONAL, as successor in interest to

RADIX GROUP INTERNATIONAL, and by receiving, retaining and converting to their own

benefit, to the detriment of MOONEY, those commissions to which he was entitled pursuant to

the EMPLOYMENT AGREEMENT.

36.     The actions of RGI GROUP, RADIX VENTURES, AEI, AEI U.S.A. and AEI

OCEAN, as described above, was willful and wanton, and in disregard of the interest of their

joint adventurer, MOONEY.

37.     MOONEY is without an adequate remedy at law and demands a full and complete

accounting, and a judgment in his favor, for the amount found to be due from each of the

Defendants, AEI, AEI U.S.A., AEI OCEAN,  RADIX VENTURES and RGI of all revenues

generated by the Miami and central Florida branch offices of AIR EXPRESS

INTERNATIONAL, prejudgment interest, attorneys' fees  accounting fees, punitive damages

and costs and such other and further relief as the Court may deem just and proper.

### COUNT II
### ACCOUNTING FROM RGI, RADIX VENTURES
### AEI, AEI U.S.A. AND AEI OCEAN

38.     MOONEY adopts and realleges paragraphs numbered 1-29 as if fully set forth

herein.

39.     This is an action for accounting within the equity jurisdiction of this Court.

40.     Pursuant to the EMPLOYMENT AGREEMENT, RGI, RADIX VENTURES,

AEI, AEI U.S.A. and AEI OCEAN owe to MOONEY the commissions reflected by the net

revenues of the Miami branch office of AIR EXPRESS INTERNATIONAL as successor in

interest to  RADIX GROUP INTERNATIONAL, from August 1, 1994 to December 1, 1997.

41.     In order to determine the dollar amount of commissions owed by each of the

*Mooney v. Radix, etc., et al.*
Page -13-

Defendants, involving extensive and complicated transactions and accounts, and the tracing of same from each Defendant, it is necessary that an accounting be taken and had between the parties to determine the amounts due to MOONEY.

42.     MOONEY is without an adequate remedy at law and demands a full and complete accounting, and a judgment in his favor, for the amount found to be due from the Defendants, AEI, AEI U.S.A., AEI OCEAN,  RADIX VENTURES and RGI of all revenues generated by the Miami and central Florida branch offices of AIR EXPRESS INTERNATIONAL, prejudgment interest, attorneys' fees  accounting fees and costs and such other and further relief as the Court may deem just and proper.

### COUNT III
### BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AGAINST RGI, RADIX VENTURES AND AEI

43.     MOONEY adopts and realleges paragraphs numbered 1-29 as if fully set forth herein.

44.     RGI is in  breach of the EMPLOYMENT AGREEMENT and its implied covenant of good faith in the following regards;

a)     It permitted AEI to strip the assets and accounts from the air freight, ocean freight, NVOCC, and warehouse and distribution departments of the Miami branch office of RADIX GROUP INTERNATIONAL and divert same to the Miami and Central Florida branch offices of AIR EXPRESS

INTERNATIONAL.  This effectively extinguished MOONEY's ability to manage and grow the revenues of the Miami office of RADIX GROUP INTERNATIONAL and earn those commissions which were a material consideration to his decision to sell Flagship to RGI,

b)      It refused to insist that MOONEY be allowed to serve as Vice President of the Miami branch office of AIR EXPRESS INTERNATIONAL, participate in its growth and revenues and develop new customers.

c)      It failed to provide an annual accounting for the fiscal periods 1995, 1996, 1997 and 1998 as required by the EMPLOYMENT AGREEMENT,

d)      It failed to pay commissions agreed to in the EMPLOYMENT AGREEMENT.

e)      It converted those funds, rightfully payable to MOONEY as commissions, to its own use and benefit, and that of its principal, AEI.

45.     RADIX VENTURES unconditionally and irrevocably guaranteed the compliance of RGI with its obligations as set forth in the EMPLOYMENT AGREEMENT.

46.     By virtue of AEI's merger with RADIX VENTURES and RGI, and by virtue of the actions taken by AEI in stripping the assets of the Miami office of RADIX GROUP INTERNATIONAL, for AEI's own benefit and without adequate consideration, AEI became successor in interest to RGI and obligated to perform all the terms and conditions of the EMPLOYMENT AGREEMENT.

(                                              (

*Mooney v. Radix, etc., et al.*
Page -15-

WHEREFORE, MOONEY requests that this court enter judgment in favor of MOONEY

and against RGI, RADIX VENTURES and AEI for compensatory damages, including lost

commissions, prejudgment interest, costs, attorneys' fees and such other relief as the court deems

just.

### COUNT IV
### IMPROPER INTERFERENCE WITH CONTRACTUAL RELATIONSHIP AGAINST AEI

47.     MOONEY adopts and realleges paragraphs numbered 1-29 as if fully set forth

herein.

48.     Prior to entering into the AEI/RADIX MERGER AGREEMENT, AEI knew that

MOONEY had an advantageous contractual relationship (the EMPLOYMENT AGREEMENT)

with RGI, whose performance and obligations were guaranteed by RADIX VENTURES.

49.     Notwithstanding such knowledge, AEI intentionally, unjustifiably and without

privilege interfered with that relationship by directing and causing the stripping of the assets and

accounts from the air freight, ocean freight, NVOCC, and warehouse and distribution

departments of the Miami branch office of RADIX GROUP INTERNATIONAL and divert

same to the Miami and Central Florida branch offices of AIR EXPRESS INTERNATIONAL.

This was designed to and did effectively extinguished MOONEY's ability to manage and grow

the revenues of the Miami branch office of RADIX GROUP INTERNATIONAL, develop new

customers and otherwise earn those commissions which were a material consideration to his

decision to sell Flagship to RGI.

50.     The conduct of AEI in stripping of the assets and accounts of RADIX GROUP INTERNATIONAL for its own use and benefit and conversion of those commissions to which MOONEY was entitled was willful and wanton, and in knowing disregard for the contractual rights of MOONEY.

WHEREFORE, MOONEY requests that this court enter judgment in favor of MOONEY and against AEI for compensatory and punitive damages, including lost commissions, prejudgment interest, costs, attorneys' fees and such other relief as the court deems just.

## *COUNT V*
### *CLAIM FOR FRAUDULENT TRANSFER AGAINST RGI, AEI, AEI U.S.A. AND AEI OCEAN*

51.     MOONEY adopts and realleges paragraphs numbered 1-29 as if fully set forth herein.

52.     MOONEY's right to payment of commissions from REI under the EMPLOYMENT AGREEMENT preexisted REI's transfer of all personnel, foreign agents, cargo, assets and accounts of the Miami branch office of RADIX GROUP INTERNATIONAL, save for those functions related to Customs Brokerage, to AEI U. S. A. and AEI OCEAN (hereinafter "the transfers").

53.     The transfers were made with the actual intent to hinder, delay, or defraud MOONEY of the commissions in violation of Fla. Stat. 726.105(1)(a); they occurred shortly after RGI incurred the obligation to MOONEY as set forth in the EMPLOYMENT AGREEMENT, the assets were removed by RGI for less than equivalent value to an insider

(AEI), the transfer has been concealed from MOONEY, the transfer was of substantially all of RGI's assets, and as a consequence of the transfer, RGI became insolvent.

54.     In the alternative, RGI did not receive equivalent value for the transfer and as a consequence, it was left with assets that were unreasonably small in relation to its business and/or RGI became insolvent in violation of Fla. Stats. 726.105(1)(a) and 726.106(1).

WHEREFORE, MOONEY requests that this court enter judgment in favor of MOONEY and against AEI for compensatory and punitive damages, including lost commissions, prejudgment interest, costs, attorneys' fees and such other relief as the court deems just.

## *COUNT VI*
### *STATUTORY CLAIM FOR NON PAYMENT OF COMMISSIONS AGAINST RGI, RADIX VENTURES AND AEI*

55.     MOONEY adopts and realleges paragraphs numbered 1-29 as if fully set forth herein.

56.     At all times material hereto, AEI and RGI have operated from their headquarters located at 120 Tokeneke Road, Darien, Connecticut.    As such they are subject to Connecticut General Statutes, Title 31, Chapter 558, Section 31 - 72 which renders them liable to their employees for the non - payment of wages, including commissions.  Section 31 - 72 entitles the employee to recover "twice the amount of such wages" upon proof that his employer failed to pay him  wages.

57.     By virtue of AEI's merger with RADIX VENTURES and RGI, and by virtue of

the actions taken by AEI in stripping the assets of the Miami branch office of RADIX GROUP INTERNATIONAL, for AEI's own benefit and without adequate consideration, AEI became successor in interest to RGI, obligated to perform all the terms and conditions of the EMPLOYMENT AGREEMENT and MOONEY's employer.

58.     Moreover, as alleged above, AEI exercised the sole and ultimate authority and control to determine MOONEY's employment activities as well as his entitlement to, accounting for and payment of commissions as described in the EMPLOYMENT AGREEMENT. As such, AEI, was MOONEY's employer from May 3, 1995 to December 31, 1998 and obligated to account for and make payment of those commissions due to MOONEY as described in paragraphs 2(b)(I) and 2(b)(ii) of the EMPLOYMENT AGREEMENT.

59.     RGI and AEI have breached the EMPLOYMENT AGREEMENT and failed to account for or pay to MOONEY those commissions to which he is entitled.

60.     Wherefore, MOONEY requests that this court enter judgment in favor of MOONEY and against AEI and RGI for twice the amount of commissions they failed to pay MOONEY, prejudgment interest, costs, attorneys' fees and such other relief as the court deems just.

(                                    (

*Mooney v. Radix, etc., et al.*
Page -19-

## **TRIAL BY JURY**

The Plaintiff, NEIL B. MOONEY, demands trial by jury of all counts and claims triable

as of right by jury.

DATED this 25 day of _March_, 1999.


*LAW OFFICE OF CHARLES CURRAN, P.A.*
*Attorney for Plaintiff*
Florida Bar #374380
P.O. Box 1753
Tallahassee, FL 32302
(Phone) :      (850)224-2566
(Fax)   :      (850)222-2153

By: _____
        CHARLES A. CURRAN

ASSET PURCHASE AND SALE AGREEMENT

DATED

JULY 8, 1994

RADIX-MOONEY

## ASSET PURCHASE AND SALE AGREEMENT

**ASSET PURCHASE AND SALE AGREEMENT** ("Agreement") dated July 8, 1994 between RADIX GROUP INTERNATIONAL, INC., having its principal place of business at 5510 West 102nd Street, Los Angeles, California 90045 ("Purchaser") and FLAGSHIP FORWARDING CORP., FLAGSHIP TRADE SERVICES, INC. and CARIBE BASIN SERVICES, INC., each a Florida corporation, and each having an address at c/o Neil Mooney, 990 Hunting Lodge Drive, Miami Springs, Florida 33166 (collectively, "Sellers").

**WHEREAS**, Sellers are engaged in the customs brokerage, freight forwarding and non-vessel operating common carrier business, as appropriate, at the Miami Facility (as defined below) in Miami, Florida (the "Business"); and

**WHEREAS**, Sellers desire to sell all of their assets, subject to all of their liabilities, to Purchaser and Purchaser desires to acquire all of Sellers' assets, subject to all of Sellers' liabilities and to pay the Purchase Price (as defined below) therefor, subject to the terms and conditions set forth below.

**NOW, THEREFORE**, it is mutually agreed as follows:

1.    Upon and subject to the conditions set forth in this Agreement, on the Closing (as defined below), Sellers shall sell,

convey, assign, transfer and deliver to Purchaser and Purchaser shall purchase and acquire, all of the Sellers' right, title and interest on the Closing in and to all of their respective assets, business, goodwill and property of any kind or nature whatsoever, including, but not limited to (a) the assets ("Fixed Assets") listed on Schedule 1 annexed hereto, (b) Sellers' interests in the leasehold improvements ("Leasehold Improvements") designated on Schedule 2 annexed hereto for the Miami, Florida facility ("Miami Facility") presently occupied by Sellers, (c) all inventory, supplies, packaging materials, cartons, boxes, inventory parts and other similar items, (d) the rights to use the names "Flagship Forwarding", "Flagship Trade Services" and "Caribe Basin Services", (e) all machinery and equipment listed on Schedule 3 annexed hereto, (f) cash, (g) accounts receivable of the Sellers, which, at May 31, 1994, are listed on Schedule 4 annexed hereto ("Current Receivables") and all accounts receivable generated by the Sellers after May 31, 1994 through 11:59 P.M. on the Closing Date ("New Receivables"; which together with Current Receivables shall be referred to as "Closing Accounts Receivable"), (h) the customer lists of the Sellers which, as at May 31, 1994, are set forth on Schedule 5 annexed hereto ("Customer Lists") and, (i) all other assets of every kind and nature of Sellers, all of the foregoing being hereinafter collectively referred to as "Assets", except that Purchaser is not acquiring the minute books, stockholder records, insurance policies and premiums and other books and records of Sellers pertaining to board of directors or stockholders meetings

-2-

or actions or records of holders of securities of Sellers or its powers of attorney, other than rights pursuant to the Sub-Powers (as defined below) being delivered pursuant to Paragraph 8(b)(v) below (collectively "Corporate Books").

2.   Subject to the terms and conditions of this Agreement, Purchaser will assume on Closing all of the liabilities ("Assumed Liabilities") of Sellers, whether actual, contingent or otherwise, as set forth on the Estimated Closing Balance Sheets (as defined below), as amended by the Post-Closing Adjustments (as defined below) to be disclosed on the Closing Balance Sheets (as defined below), and those liabilities set forth in this Agreement to be expressly assumed by Purchaser. Purchaser is not acquiring or assuming any liabilities of Sellers, whether actual, contingent or otherwise, except as set forth on the Estimated Closing Balance Sheets as amended by the Post-Closing Adjustments to be disclosed on the Closing Balance Sheets and expressly do not assume any other obligation or liability of Sellers under this Agreement or otherwise in connection with the transactions contemplated hereby.

3.   The Purchase Price ("Purchase Price") for the Assets shall be determined as set forth hereinbelow as of the Closing.

(a)   The Purchase Price shall be paid by Purchaser to Sellers in full at Closing by certified or bank check payable to the order of Sellers.   The Purchase Price shall be computed

-3-

initially on the basis of the Sellers' balance sheets as at May 31, 1994 ("Estimated Closing Balance Sheets"), copies of which are annexed hereto as <u>Schedule 6</u>, and shall equal the total stockholders equity, to wit:

| <u>Sellers</u> | <u>Amount</u> |
|---|---|
| Flagship Forwarding Corp. | $ 335,232.13* |
| Flagship Trade Services, Inc. | $ 586,195.85 |
| Caribe Basin Services, Inc. | $ 88,771.97 |
| Total: | $1,010,199.95* |

*less $44,500 accounts receivable from Transpomer, Panama to be retained by Sellers and not transferred to Purchaser.

(b)  The computation of the Purchase Price set forth in Subsection (a) above shall be subject to Post Closing Adjustments ("Post Closing Adjustments") being the monetary differences between the chart of accounts on the Estimated Closing Balance Sheets and the Closing Balance Sheets, based on the final Closing Balance Sheets for the Sellers ("Closing Balance Sheets") as at the Closing Date, which will be prepared jointly by Neil Mooney and Matthew P. Sheppard, an officer of Purchaser, in the same format as the Estimated Closing Balance Sheets consistent with present practices and chart of accounts of Sellers provided they are in compliance with Section 5(m) below, and delivered to both parties within 30 days after the Closing Date.  There shall be

its to the Estimated Closing Balance Sheets, a

receivable, and to the Closing Balance Sheets, a

eceivable and accounts payable.  In the event the

e to agree as to the Post-Closing Adjustments

5) days thereafter, the parties will mutually

-4-

agree on a third party to make such determination.  If they are unable to so agree, either party may request the American Arbitration Association to appoint a certified public accountant to make such determination, the determination of such third party shall be conclusive and the cost thereof split equally between Purchaser, on the one hand, and Sellers, on the other.

(c)  In the event that the Purchase Price, as adjusted for the Post-Closing Adjustments, is greater than the Purchase Price paid at the Closing, then, within ten (10) days after receipt of the Closing Balance Sheets, Purchaser shall pay to Sellers the amount of such difference.  In the event the Purchase Price as so redetermined is less than the Purchase Price paid at the Closing, then Sellers shall pay such difference to Purchaser within ten (10) days after receipt of the final determination of the Closing Balance Sheets as set forth above.

4.  The closing ("Closing") under this Agreement shall be held at 10:00 a.m. on July 8, 1994 effective as of 11:59 P.M. on that date ("Closing Date").  The Purchase Price shall be delivered to Sellers at Closing.

5.  In order to induce Purchaser to enter into this Agreement, Sellers jointly and severally make the following representations and warranties as of the date hereof and as of the Closing Date:

-5-

(a) Each of the Sellers is a corporation, duly organized, validly existing and in good standing under the laws of the State of Florida and each has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted and is duly qualified to do business in and is in good standing in all jurisdictions in which the ownership or leasing of its property or the conduct of its business requires it to qualify to do business.

(b) Each of the Sellers has the corporate power and authority to enter into and perform the terms and provisions of this Agreement. This Agreement has been duly authorized by the Board of Directors and stockholders of each of the Sellers and constitutes the legal, valid and binding obligation of each of the Sellers, enforceable in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights.

(c) None of the Sellers own any capital stock of any other corporation and no Seller controls, directly or indirectly, or owns any other proprietary interest in any partnership, joint venture, trust or other entity.

(d) Neither the execution, delivery nor performance of this Agreement nor compliance with the terms and provisions of this Agreement on the part of any of the Sellers will (i) require the consent, waiver, approval, or license of a public authority, (ii) violate any statute, license or regulation of any governmental authority, domestic or foreign, applicable to Sellers or the Business, or result in the default by any of the Sellers of any judgment, order, writ, decree, rule or regulation of any court or administrative agency, or (iii) breach, conflict with, or result in a breach of any of the terms, conditions or provisions of any of the Sellers' Certificate of Incorporation or By-Laws, or any agreement or instrument to which any of the Sellers are a party or by which any of the Sellers is or may be bound,

-6-

or constitute a default thereunder, or result in the creation or imposition of any Encumbrance (as defined below) of any nature whatsoever upon, or give to others any claim, interest or rights, including rights of termination or cancellation in, any of the Assets or Business of the Sellers.

(e)   Sellers have good and marketable title to all of the Assets, free and clear of any and all mortgages, liens, security interests, pledges, charges, restrictions, conditions, or other encumbrances of any kind or nature (collectively "Encumbrances").

(f)   All of the Fixed Assets and Leasehold Improvements are and shall be on the Closing Date, in working order and condition, and are at the Miami Facility.

(g)   Except as specifically noted on the Customer Lists, Sellers have no notice that any of said customers intend to discontinue using Sellers' services or that any of said customers are the subject of any voluntary or involuntary bankruptcy or similar proceedings.

(h)   There are no contracts with customers other than those identified on the Customer Lists. There are no service or other contracts affecting the Fixed Assets other than those listed on Schedule 7 annexed hereto.

(i)   There are no actions, suits or proceedings pending or, to the knowledge of Sellers, threatened against Sellers or Neil Mooney ("Mooney") or any of his properties in any court or by or before any Federal, state or other governmental agency or any arbitration panel or similar body, except as listed on Schedule 8 annexed hereto.

(j)   Sellers have all of the necessary permits, consents, approvals and licenses required for the conduct of the Business and all such permits, consents, approvals and licenses are listed on Schedule 9 annexed hereto.

(k)   All employees of Sellers are listed in Schedule 10 annexed hereto and the salary and other compensation payable to each listed thereon is complete and accurate. Sellers

-7-

agree to terminate and Purchaser agrees that it will hire as of the Closing Date those employees of Sellers listed on __Schedule 10-1__ annexed hereto at their respective current salaries set forth on Schedule 10 (other than Mooney whose employment is provided for elsewhere). Sellers shall be responsible for all salary and other benefits due to employees accruing prior to the Closing Date except that Purchaser will be responsible for accrued sick days and vacation days set forth on Schedule 10-1 for employees hired by Purchaser. Sellers represent that there is no current union contract or any pending labor dispute, including any proceeding before the National Labor Relations Board or other similar agency.

(l)   There are no equipment leases.

(m)   Sellers have delivered to Purchaser the following financial statements ("Financial Statements") of the Sellers (copies of which are annexed hereto as Schedule 21):

    (i)   Unaudited Balance Sheet as at May 31, 1994 and Income Statement showing Results of Operations for the five-month period ended May 31, 1994 ("May Financial Statements");

    (ii)   Unaudited Combined Balance Sheets as at December 31 of each year from 1988 to 1993; and

    (iii)   Unaudited Combined Income Statements showing Results of Operations for the years ended December 31 of each year from 1988 to 1993.

The Financial Statements (i) are in accordance with the books and records of the Sellers, (ii) are true, complete and accurate in all material respects, except for 1990 as noted thereon and (iii) present fairly the financial position of the Sellers as of the dates thereof.

(n)   The Sellers have no liabilities or obligations of any nature, whether accrued, absolute, contingent, or otherwise except accounts payable in the normal course of business and as otherwise set forth on the Schedules hereto

-8-

or otherwise reflected on the Financial Statements; and the Sellers will not have any liability at the Closing, whether accrued, absolute, contingent or otherwise, except as set forth herein and those arising out of customary transactions in the ordinary conduct of their respective businesses with unaffiliated third parties (except for rent for the Miami Facility and intercompany transactions among Sellers), between the date hereof and the Closing.

(o) The Current Receivables arose and the New Receivables as of the Closing Date shall have arisen from bona fide transactions made in the ordinary course of business with unaffiliated third parties and each such Account Receivable was or will be billed without discount (other than their standard 1% discount) within thirty (30) days after the date on which it arose. All such Closing Accounts Receivable are collectible in the ordinary course of business other than as set forth on Schedule 4-1 and Sellers have no knowledge that any party obligated to pay any of such Closing Accounts Receivable is insolvent or bankrupt or undergoing relief pursuant to the provisions of any applicable bankruptcy or insolvency law.

(p) Each of the Sellers and their officers, directors and employees hold those licenses, permits, consents, waivers and approvals (collectively "Approvals") listed on <u>Schedule 11</u> annexed hereto, free and clear of any Encumbrance and no consent, approval or waiver is required for the continued use by Sellers of such Approvals after Closing. The Approvals are the only licenses, permits, consents, waiver and approvals required by Sellers from any Federal, state or local governmental authority or agency to enable each of Sellers lawfully to conduct its business as such business is now being conducted. All filings necessary in connection with the maintenance of the Approvals have been timely filed.

(q) <u>Schedule 12</u> annexed hereto lists all instruments and arrangements creating Encumbrances on any real or personal property of the Sellers, and all notes, mortgages,

-9-

pledges, deeds of trust, security, loan, or credit agreements to which any of the Sellers is a party or which relate to any real or personal property of the Sellers.

(r)    Schedule 13 annexed hereto lists all contracts for any amount in excess of One Thousand ($1,000) Dollars to which any of the Sellers is a party, including but not limited to employment contracts, contracts with labor unions or associations, contracts relating to legal, accounting, management, consulting or other services; contracts for the purchase or sale of real or personal property; contracts for capital expenditures.

(s)    Schedule 14 annexed hereto lists all leases and other agreements to which any of the Sellers is a party relating to real or personal property or any interest therein.

(t)    Schedule 15 annexed hereto lists all real estate, buildings, machinery and equipment (including office equipment having a net book value in excess of One Thousand ($1,000) Dollars) owned by any of the Sellers or in which any of the Sellers has an interest.

(u)    Schedule 16 annexed hereto lists the name and address of each bank in which any of the Sellers has an account or safe deposit box, and the names of all persons authorized to draw thereon or to have access thereto.

(v)    Schedule 17 annexed hereto lists all vehicles owned or leased by any of the Sellers.

(w)    Sellers are not obligated under any lease, license, contract, agreement, commitment, plan or arrangement, either oral or written, except for obligations set forth on the Schedules annexed hereto or not required to be listed thereon because of the monetary amount hereof.

(x)    Sellers are not in default in respect of (1) any obligation to be performed by any of them under any lease, license, contract, agreement, commitment or arrangement, note mortgage, pledge, deed, or trust agreement except as set forth herein or listed in the Schedules annexed hereto, or (2) any material

-10-

applicable law or regulation or any order of any court or governmental authority.

(y) All of the leases, licenses, contracts, agreements, commitments and arrangements of the Sellers listed on the Schedules annexed hereto are valid and existing agreements and are enforceable in accordance with their terms except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights, and no event has occurred which, with or without notice or the passage of time, or both, would constitute a default thereunder or permit termination thereof.

(z) Between May 31, 1994 and the Closing, the Sellers have and will continue to cause the Sellers not to (1) except in customary transactions in the ordinary course of business (a) sell, lease or otherwise dispose of, or suffer to exist, any Encumbrance against, or defect in title to, any of the Assets, (b) incur or discharge any liability or obligation, (c) waive any material rights, or (d) enter into or terminate any material contract; (2) make any extraordinary or unusual expenditures or commitments; (3) enter into or engage in any transaction other than in the ordinary course of business; (4) borrow any money or increase its obligations by way of guaranty, endorsement, indemnity, or otherwise, except in the ordinary course of business; (5) declare, set aside, or pay any dividend or other distribution in respect of, or purchase, redeem, or otherwise acquire any of its outstanding capital stock or securities or issue any capital stock or security or any bond, note, or other instrument convertible into any capital stock or security of Sellers or issue any put, call, warrant or other such instrument relating to the purchase or sale of capital stock of Sellers or make any commitment or incur any liability or make any payment of any kind or nature to Mooney or any affiliate of Sellers or Mooney or relatives of Mooney other than the payment of salary as identified on Schedule 10; (6) increase or commit to increase the compensation payable to officers, directors, or consultants, or pay or

-11-

commit to pay bonuses (other than as set forth
on Schedule 10) or other forms of incentive or
additional compensation, welfare, pension,
retirement, or similar payments or
arrangements except pursuant to contracts
included in the Schedules annexed hereto or
after consultation with and approval by
Purchaser; or (7) suffer any material adverse
change in its Business, financial condition or
net worth.

(aa) (i) All income tax returns required to be
filed by the Sellers with the United States of
America, any foreign government and any state
or local governmental unit have been timely
filed or applications for extension of time
for filing any tax return have been timely
filed and (ii) no consent to any extension of
the period of limitations applicable to the
assessment or collection of any tax is in
effect. __Schedule 18__ annexed hereto reflects
the jurisdictions in which the Sellers
currently file income tax returns. Sellers
and Mooney have no notice that any
deficiencies in Federal, state, foreign or
local income taxes of the Sellers have been
determined by the Internal Revenue Service or
any other taxing authority for the last four
(4) fiscal years. No audits by the Internal
Revenue Service or any other taxing authority
are now pending. No taxes (including
withholding taxes), franchise fees or other
similar payment or any interest or penalties
are or shall be due and unpaid to the Federal
or any foreign, state or local governmental
unit for any period through the Closing,
except to the extent set forth on the May
Financial Statement and undistributed income
earned thereafter;

(bb) None of the Sellers is in default in respect
of any indebtedness for borrowed money or
under the terms of any agreement under which
any indebtedness is outstanding, as principal
obligor, guarantor, endorser or otherwise;

(cc) Sellers shall maintain in effect all existing
insurance policies which are listed on
__Schedule 19__ annexed hereto or policies
providing equivalent coverage through the
Closing Date;

-12-

(dd) Sellers have made available to Purchaser and Purchaser's representatives true and complete copies and summary descriptions of all bonus, pension, stock option, stock purchase, benefit, welfare, profit sharing, retirement, disability, unemployment, severance, workers compensation, insurance, incentive, Internal Revenue Code ("Code") Section 501(c)(9) trust, deferred compensation and other similar fringe or employee benefit plans, funds, programs or arrangements, all employment contracts or executive compensation agreements, written or oral, in each of the foregoing cases which cover, are maintained for the benefit of, or relate to any or all employees, former employees or retirees of the Sellers. All such plans, programs, agreements and contracts are listed on <u>Schedule 20</u> annexed hereto;

(ee) Sellers' Profit Sharing Plan (the "Plan"), in effect prior to Closing has complied in all material respects with the applicable requirement of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and has met the requirements of "qualified plans" under Section 401(a) of the Code and has been found by the Internal Revenue Service to be so qualified. Nothing has occurred since such finding of qualification which could cause the loss of such qualification. The Plan is not a multi-employer plan within the meaning of Section 3(37) of ERISA. All required reports and descriptions (including Form 5500 Annual Reports, Summary Annual Reports and Summary Plan Descriptions) have been appropriately filed or distributed with respect to the Plan. Sellers, at their sole expense, shall timely file the current Form 5500 due on or before July 31, 1994 and shall, thereafter, terminate the Plan with appropriate rollover or other applicable distributions in connection therewith. All amendments to the Plan required to be adopted and executed within the remedial amendment period described in Section 401(b) of the Code and regulations thereunder as a condition of qualification have been or will be timely adopted and executed;

(ff) No accumulated funding deficiency within the meaning of Section 3092 of ERISA or Section 412 of the Code has been incurred with respect to the Plan. With respect to the Plan (i)

-13-

there have been no prohibited transactions as defined in Section 406 of ERISA or Section 4975 of the Code, and (ii) no actions, suits, or claims with respect to the assets thereof (other than routine claims for benefits) are pending or, to Sellers' or Mooney's knowledge, threatened and Sellers have no knowledge of any facts which would give rise to or could reasonably be expected to give rise to any such actions, suits or claims;

(gg) The Plan has not been completely or, partially terminated since its establishment and the Plan has not been the subject of a "reportable event" as that term is defined in Section 4043 of ERISA as to which notices would be required to be filed with the Pension Benefit Guaranty Corporation ("PBGC"). No proceeding by the PBGC to terminate the Plan has been instituted or, to Sellers' knowledge, threatened, there is no pending or, to the best of Sellers' knowledge, threatened legal action, proceeding or investigation against or involving any employee pension benefit plan and there is no basis for any such legal action, proceeding or investigation;

(hh) Sellers have the right to use, without payment or limitation, the service marks and tradenames "Flagship Forwarding", "Flagship Trade Services" and "Caribe Basin Services" which are the only patents, trademarks or licenses used by the Sellers in connection with the operation of their business. There are no filed trademarks or tradenames. There is no basis for any liability of any of the Sellers nor have any of the Sellers given any indemnification or paid any damages (by way of court order or settlement) for patent, trademark, trade name or copyright infringement as to any equipment, materials, goods, merchandise or supplies manufactured, produced, used or sold by them; and

(ii) No representation or warranty by the Sellers in this Agreement, nor any statement, certificate or exhibit furnished, or to be furnished, by or on behalf of Sellers pursuant to this Agreement, nor any document or certificate delivered to Purchaser pursuant to this Agreement, or in connection with actions contemplated hereby, contains or shall contain

-14-

any untrue statement of a material fact, or omits, or shall omit to state a material fact necessary to make the statements contained therein not misleading.

6. Purchaser hereby represents, warrants and agrees as of the date hereof and as of the Closing Date, as follows:

(a) Purchaser is a corporation, duly organized, validly existing and in good standing under the laws of the State of California and has all requisite corporate power and authority to own, lease and operate its property and to carry on its business as now being conducted and is duly qualified to do business in and is in good standing in all jurisdictions in which the ownership or leasing of its property or the conduct of its business requires it to qualify to do business.

(b) Purchaser has the corporate power and authority to enter into and perform the terms and provisions of this Agreement. This Agreement has been duly authorized by the Board of Directors of Purchaser and constitutes the legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights.

(c) Neither the execution, delivery nor performance of this Agreement nor compliance with the terms and provisions of this Agreement on the part of the Purchaser will (i) require the consent, waiver, approval, or license of a public authority, (ii) violate any statute, license or regulation of any governmental authority, domestic or foreign, applicable to Purchaser, or result in the default by Purchaser of any judgment, order, writ, decree, rule or regulation of any court or administrative agency, or (iii) breach, conflict with, or result in a breach of any of the terms, conditions or provisions of Purchaser's Certificate of Incorporation or

-15-

By-Laws, or any agreement or instrument to which Purchaser is a party or by which Purchaser is or may be bound, or constitute a default thereunder, or result in the creation or imposition of any Encumbrance of any nature whatsoever upon, or give to others any claim, interest or rights, including rights of termination or cancellation in, any of the assets or business of the Purchaser.

(d)   Purchaser has all material licenses necessary to operate the Business as part of its organization after Closing.

(e)   No representation or warranty by the Purchaser in this Agreement, nor any statement, certificate or exhibit furnished, or to be furnished, by or on behalf of Purchaser pursuant to this Agreement, nor any document or certificate delivered to Sellers pursuant to this Agreement, or in connection with actions contemplated hereby, contains or shall contain any untrue statement of a material fact, or omits, or shall omit to state a material fact necessary to make the statements contained therein not misleading.


7.   At Closing, Sellers agree to transfer to Purchaser the right to use the names "Flagship Forwarding", "Flagship Trade Services" and "Caribe Basin Services" or similar names in the conduct and operation of its Business and Sellers agree to deliver to Purchaser in connection therewith, at Sellers' cost, a Certificate of Amendment changing their corporate names so as to delete the word "Flagship" and "Caribe Basin" together with such other instruments as may be required to consent to the formation by Purchaser of a new corporation with that name and/or the use of such name as a tradename. By mutual agreement, any other provision of this Agreement notwithstanding:

-16-

(i) Flagship Trade Services, Inc. may continue to operate a U.S. Customs bonded warehouse (C.F.S.) at 1550 NW 96th Ave. until Purchaser is authorized to do so. All benefits to Flagship Trade Services, Inc. from so doing will accrue to the benefit of Purchaser to be established at the time of final reconciliation; and

(ii) Flagship Forwarding Corp. will maintain its current bank account with Towerbank, Panama City, Republic of Panama, with all appropriate collections for forwarding services and international transport to accrue to Purchaser. These monies are to be remitted to Purchaser within 30 days of collection in Panama.

8. At the Closing, the following shall occur and each of the following shall be a condition to Closing:

(a) Purchaser shall deliver to Sellers:

(i) the Purchase Price, by wire transfer or certified or bank check payable as directed by Sellers;

(ii) the Consulting Agreement ("Consulting Agreement") among Sellers and Purchaser executed by Purchaser, and guaranteed by Purchaser's parent company, Radix Ventures, Inc., in the form of Exhibit A hereto;

(iii) an employment agreement ("Employment Agreement") between Neil Mooney ("Mooney") and Purchaser executed by Purchaser in the form attached hereto as Exhibit B;

(iv) a certificate of an officer of Purchaser that all representations and warranties of Purchaser contained herein and in any certificate or other instrument delivered pursuant to the provisions hereof or in connection with the transactions contemplated hereby are true and correct on the Closing

-17-

Date with the same force and effect as though such representations and warranties had been made on the Closing Date;

(v)     the lease referred to in Section 15 below ("Space Lease") executed by Purchaser, the form of which is annexed hereto as Exhibit C; and

(vi)    the Non-Competition Agreement ("Non-Competition Agreement") among Sellers and Mooney and Purchaser executed by Purchaser, and guaranteed by Purchaser's parent company, Radix Ventures, Inc., in the form of Exhibit D hereto;

(vii)   current Good Standing Certificates for Purchaser from California and Florida.

(viii)  Certified resolutions of Sole Shareholder of Purchaser and the Board of Directors of Radix Ventures, Inc. authorizing this transaction and the guaranty hereunder.

(b)  Sellers shall deliver to Purchaser the following:

(i)     a Bill of Sale for the Fixed Assets in form reasonably acceptable to Purchaser together with all other documentation required by applicable authorities for the transfer of any motor vehicles or other Fixed Assets to Purchaser;

(ii)    such other bills of sale, assignments, consents and transfer documents, in form reasonably satisfactory to Purchaser's counsel and consistent with the terms, provisions and conditions of this Agreement, sufficient to transfer, assign and convey to Purchaser all of the Assets subject to the Assumed Liabilities;

(iii)   the Consulting Agreement executed by Sellers and guaranteed by Mooney;

-18-

(iv)   the Employment Agreement executed by Mooney;

(v)    a Letter of Authorization and Sub-Power of Attorney ("Sub-Powers") authorizing Purchaser to act on behalf of Sellers in all customs transactions under all existing Powers of Attorney to Sellers from their customers for a period of six months after Closing;

(vi)   all books of account, all papers, tape, disk and firm records, contracts, licenses, agreements and other corporate papers and instruments, of every kind pertaining to the Business; provided, however, that Sellers may retain Sellers' Corporate Books and copies of such other books and records as may reasonably be required for the preparation of financial statements and/or tax returns;

(vii)  the documents to be delivered pursuant to Paragraph 7 duly executed and acknowledged and in form for filing, where applicable, together with the filing fees therefor;

(viii) certified resolutions of all shareholders and directors of Sellers giving their consent to and authorizing the transactions contemplated by this Agreement;

(ix)   a certificate of Sellers stating that all representations and warranties of Sellers contained herein and in any certificate or other instrument delivered pursuant to the provisions hereof or in connection with the transactions contemplated hereby are true and correct on the Closing Date with the same force and effect as though such representations and warranties had been made on the Closing Date;

(x)    the Space Lease executed by Sellers' affiliate, Flagship Properties, Inc. ("FPI"); and

-19-

(xi)    the Non-Competition Agreement executed
        by Sellers and Mooney and agreed to by
        Margaret Mooney;

(xii)   current Good Standing Certificates from
        Florida for each of Sellers.

(c)  Sellers shall transfer to the account of Purchaser as designated by Purchaser the cash of the Sellers (exclusive of amounts to cover outstanding checks).

9.   Sellers, on the one hand, and Purchaser, on the other, each warrant and represent to the other that it has dealt with no broker in connection with the within transactions and each agrees to indemnify and hold the other harmless from and against any expense arising out of the acts of such party in connection with any broker.

10.  Sellers will fully cooperate with Purchaser in obtaining from Sellers' customers Powers of Attorney or letters of authorization in Purchaser's standard form in favor of Purchaser for use in clearance of shipments through U.S. Customs.

11.  A.  From time to time after Closing, the parties shall make the following adjustments to the Purchase Price calculated as of the close of business on the Closing Date to the extent not reflected on the Closing Balance Sheet:

(a)  the amount of all customs duties, freight
     charges and other prepaid expenses paid by

-20-

Sellers on shipments invoiced by Purchaser shall be added to the Purchase Price;

(b) all amounts received in advance by Sellers for services to be performed after the Closing Date shall be deducted from the Purchase Price. In the event that after the Closing Date, Purchaser pays any customs duties, freight or other charges relating to transactions invoiced by the Sellers, Sellers shall immediately reimburse Purchaser therefor and, to the extent not paid by Sellers to Purchaser, Purchaser shall have the right to setoff such amount against any amounts otherwise payable to Sellers. Purchaser shall notify Sellers thereof prior to payment to the extent reasonably possible;

(c) the out-of-pocket costs to Purchaser, if any, resulting from Purchaser being responsible for sick and vacation days of hired employees accruing prior to the Closing Date;

(d) all personal property taxes due with respect to the Assets shall be prorated on the basis of the fiscal period for which assessed and the actual taxes due and paid by the parties to the extent it is their obligation prior to the due date thereof; and

(e) In the event that Sellers have completed or substantially completed a transaction on the Closing Date and a bill for Sellers' work in connection with such transaction has not been issued, Sellers shall be entitled to bill such amount within fifteen (15) days after Closing and such invoices will be deemed automatically added to the Closing Accounts Receivable assigned to Purchaser and added to the Closing Balance Sheets. Purchaser shall pay to Sellers the amount collected, less out-of-pocket expenses of Purchaser and amounts due to third parties in connection with such transaction. In the event that Sellers substantially complete a transaction prior to the Closing Date and a bill for such transaction is issued by Purchaser after the Closing, then, upon collection of such bill, Sellers and Purchaser shall mutually agree on an allocation of the amount due to Sellers from the amount collected, after payment of Purchaser's out-

-21-

of-pocket expenses and amounts due to third
parties in connection with such transaction.

Any amount subject to adjustment pursuant to this Section 11 not
paid at Closing shall be adjusted promptly after notice from one
party to the other.

B.   In the event that there are Assumed Liabilities
payable on or before January 31, 1995 that Purchaser does not pay
by such date ("Unpaid Assumed Liabilities") and provided that there
are no outstanding claims concerning such Unpaid Assumed
Liabilities or the services or goods that are the basis for such
Unpaid Assumed Liabilities ("Uncontested Unpaid Assumed
Liabilities"), then in such event,  Purchaser agrees to pay to
Sellers on January 31, 1995 the amount of the Uncontested Unpaid
Assumed Liabilities less any expenses incurred by Purchaser in
connection therewith; provided, however, in the event that
subsequent to such payment, Purchaser pays all or any portion of
the Uncontested Unpaid Assumed Liabilities to creditors, Sellers
shall immediately reimburse Purchaser for the amount of such
payments, including reasonable costs and expenses in connection
therewith.  In the event that Purchaser pays creditors less than
the full amount of the Unpaid Assumed Liabilities, then in such
event, Purchaser shall pay Sellers the difference between the
amount of the Unpaid Assumed Liabilities and the amount paid to
creditors, less Purchaser's reasonable out-of-pocket costs,
including reasonable attorneys fees.

-22-

12.   Until the Closing Date, upon reasonable notice, Sellers shall afford Purchaser and its officers, employees, counsel, accountants and other authorized representatives ("Representatives") access, during normal business hours, to the properties of, and all contracts, books and records of or relating to Sellers and, the Business and the Assets, and to any employees of Sellers responsible for the Business, and Mooney will furnish to Purchaser and its Representatives, such financial and operating data and other information with respect to the Business as Purchaser shall from time to time reasonably request.

13.   A.   Sellers agree to jointly and severally indemnify, defend and hold harmless Purchaser from and against any and all costs, liabilities, damages or obligations (including reasonable attorney's fees and other costs incurred by Purchaser in connection with the investigation and/or defense of any claim to which this indemnity applies) arising out of (i) any breach of any covenant, agreement, representation or warranty or any misrepresentation by Sellers contained in this Agreement, (ii) any activities of the Sellers, their officers, directors, employees or representatives after Closing, (iii) any failure by Sellers to otherwise comply with the terms of this Agreement, or (iv) any invalidity of the Sub-Powers caused by invalidity of the underlying power of attorney.

-23-

B.   Purchaser agrees to indemnify, defend and hold harmless Sellers from and against any and all costs, liabilities, damages or obligations (including all attorney's fees and other costs incurred by Sellers in connection with the investigation and/or defense of any claim to which this indemnity applies) arising out of (i) any breach of any covenant, agreement, representation or warranty or any misrepresentation by Purchaser contained in this Agreement, (ii) any activities of the Purchaser, its officers, directors, employees or representatives after Closing, (iii) any failure by Purchaser to otherwise comply with the terms of this Agreement, or (iv) use of the Sub-Powers by Purchaser (other than claims based on invalidity of the underlying power of attorney).

C.   Promptly after the assertion of any claim or the commencement of any action or proceeding with respect to any loss for which indemnity is provided pursuant to this Section 13, the party seeking such indemnification shall notify the indemnifying party of such assertion or proceeding; provided, however, that the failure promptly to give such notice shall not affect any indemnified party's rights hereunder except to the extent that such failure shall adversely affect any indemnifying party or its rights hereunder.  The indemnified party shall afford the indemnifying party the opportunity, at the indemnifying party's sole cost and expense, to assume and conduct the defense against such claims for liability.  In any such action or proceeding the

-24-

## CONSULTING AGREEMENT

Agreement made this 8th day of July, 1994, by and among RADIX GROUP INTERNATIONAL, INC., having its principal place of business at 5510 West 102nd Street, Los Angeles, California 90045 ("RGI"), FLAGSHIP FORWARDING CORP., FLAGSHIP TRADE SERVICES, INC., and CARIBE BASIN SERVICES, INC., each a Florida corporation (collectively, the "Corporations"), each having an address at c/o Neil Mooney, 990 Hunting Lodge Drive, Miami Springs, Florida 33166.

## W I T N E S S E T H:

WHEREAS, contemporaneously herewith RGI is purchasing the assets (subject to liabilities) of the Corporations pursuant to an Asset Purchase and Sale Agreement ("Purchase Agreement") dated July 8, 1994 by and between the Corporations, as sellers, and RGI, as purchaser; and

WHEREAS, Neil Mooney ("Mooney") is the sole shareholder of the Corporations and as such anticipates receiving significant benefits from such sale; and

WHEREAS, RGI has informed the Corporations and Mooney that the execution by the Corporations and Mooney of this Agreement is a condition precedent to such sale because of the fact that RGI desires to benefit from the experience of the Corporations and Mooney and their relationship with the customers of the Corporations.

NOW, THEREFORE, in consideration for the payments to be made by RGI to the Corporations hereunder and as a further inducement for RGI to purchase certain of the assets of the

Corporations pursuant to the Purchase Agreement, the parties hereto agree as follows:

1.   RGI hereby retains the Corporations as consultants and the Corporations hereby agree to act as consultants to RGI in connection with those matters set forth hereinbelow in this paragraph 1 for a four-year period commencing on the date hereof and ending June 30, 1998.  The services to be performed by the Corporations hereunder shall be to act as liaison between RGI and the customers of the Corporations and to assist RGI in obtaining and retaining such customers as customers of RGI.  In connection therewith, the Corporations agree to cause Mooney as an officer of the Corporations (so long as he is alive and competent) to provide the services to RGI on behalf of the Corporations hereunder.

2.   For such consultation, the Corporations shall receive a compensation hereunder of Three Hundred Seventy-Five Thousand ($375,000) Dollars per year for each of the four years of the term hereof, payable as follows:

> (i)   Three Hundred Seventy-Five ($375,000) Dollars, representing the first year's compensation, on the date hereof; and
>
> (ii)  quarter-annual payments of Ninety Three Thousand Seven Hundred Fifty ($93,750) Dollars due on the first day of each July, October, January and April during the second through fourth years of the term hereof.

All checks hereunder will be made payable to Flagship Trade Services, as an accommodating factor, but shall be for the benefit of the Corporations jointly. Neither the death or disability of Mooney nor the termination or cessation of Mooney's employment by RGI, with or without cause, shall affect the obligations of RGI to make the payments to the Corporations under Section 2 hereof.

3.   The Corporations and Mooney each understands and agrees that all information relating to RGI and/or any of its affiliates, their services, activities, customer lists, pricing information and proprietary rights, which is not generally known to the public, including information obtained by RGI from the Corporations and/or Mooney, shall be treated by them as confidential and neither shall disclose any such information to any person, firm or company. The Corporations and Mooney each further agrees not to use or attempt to use any of such confidential information for its own purposes or for any purposes whatsoever which would not be in the best interests of RGI. In the event that the Corporations and/or Mooney receive a request to disclose any confidential information under the terms of a valid and effective order issued by a court of competent jurisdiction, prior to taking any action, the Corporations and/or Mooney agree to (i) immediately notify RGI of the existence, terms and circumstances surrounding such a request, (ii) consult RGI on the advisability of taking legally available steps to resist or narrow such request, and (iii) if disclosure of such confidential information is required, the Corporations and/or Mooney, at RGI's expense, will exercise best efforts to obtain an order or other reliable assurance that

-3-

confidential treatment will be accorded to such portion of the confidential information which RGI so designates.

4.   Any breach of the foregoing covenants in Section 3 above will cause irreparable injury and incalculable damage to RGI, its subsidiaries and affiliates and RGI or any affiliate and/or subsidiary accordingly shall be entitled to apply for and obtain injunctive relief for same in any court of competent jurisdiction in addition to all other remedies which might be available to it or them.  The provisions of this Section 4 and of Section 3 shall survive termination or expiration of the term hereof.

5.   Any notice or other communication required or desired to be given shall be in writing and shall be sent by registered or certified mail, return receipt requested.  Each such notice shall be deemed given upon deposit in any depository therefor maintained by the United States to the following respective addresses, which any party may change as to such party upon ten (10) days' notice to the other party:

> To Corporations or     990 Hunting Lodge Drive
>     Mooney:             Miami Springs, Florida 33166
>                         Attn: Neil Mooney, President
>
> with a copy to:        Steven Oppenheim, Esq.
>                        Oppenheim & Associates
>                        7th Floor
>                        1110 Brickell Avenue
>                        Miami, Florida 33131
>
> To RGI:                230 Park Avenue, Suite 630
>                        New York, New York 10169
>                        Attn: Pierre L. Schoenheimer
>
> With a copy to:        Spitzer & Feldman P.C.
>                        405 Park Avenue
>                        New York, New York 10022
>                        Attn: Kenneth Gliedman, Esq.

-4-

6.   This Agreement embodies the entire understanding and agreement of the parties hereto in relation to the subject matter hereof, and no promise, condition, representation or warranty, express or implied, not herein set forth shall bind any party hereto. None of the terms and conditions of this Agreement may be changed, modified, waived or cancelled orally or otherwise except by a writing signed by the parties hereto, specifying such change, modification, waiver or cancellation.   A waiver at any time of compliance with any of the terms and conditions of this Agreement shall not be considered a modification, cancellation or waiver of such terms and conditions of any preceding or succeeding breach thereof unless expressly so stated.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs, executors administrators and personal representatives.   The assignment of this Agreement by RGI shall not relieve RGI from liability hereunder or from the obligations imposed upon RGI hereunder nor release Radix Ventures, Inc. from its guaranty hereunder.   This Agreement may not be assigned by the Corporations or Mooney.   The invalidity or unenforceability of any particular provision of this Agreement or portions thereof, shall not affect the other provisions or portions thereof, and this Agreement shall be construed in all respects as if any such invalid or unenforceable provisions or portions thereof were omitted.   This Agreement may be executed in two or more counterpart, each of which shall constitutes an original and all of which shall constitute one and the same agreement.   In the event of a dispute arising under this Agreement, the prevailing party in the dispute shall be entitled to

receive reimbursement of its reasonable legal fees, costs and expenses from the other party, through any applicable appeal. Each party shall, upon the reasonable request of the other party, execute and deliver or cause to be executed and delivered such agreements, documents, certificates and instruments and perform such other acts as may be necessary or desirable in order to fully effectuate the purposes, terms and conditions of this Agreement, whether at or after the date hereof.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and year first above written.

RADIX GROUP INTERNATIONAL, INC.

By: _____
    Name:  Matthew Sheppard
    Title: Executive Director

FLAGSHIP FORWARDING CORP.

By: _____
    Name:  Neil Mooney
    Title: President

FLAGSHIP TRADE SERVICES, INC.

By: _____
    Name:  Neil Mooney
    Title: President

CARIBB BASIN SERVICES, INC.

By: _____
    Name:  Neil Mooney
    Title: President

-6-

## GUARANTY OF RADIX VENTURES, INC.

As further consideration in connection with the foregoing transaction, the undersigned guarantor, being the sole shareholder of RGI, hereby unconditionally and irrevocably guarantees compliance by RGI with the terms, covenants, agreements and conditions of the above Agreement and the obligations of RGI contained in or arising out of the above Agreement, and guarantor agrees to be personally bound to the same extent and upon the same terms, covenants, agreements and conditions imposed upon or relating to RGI under the above Agreement including, but not limited to, the payments to the Corporations under Section 2 thereof and the provision relating to legal fees and costs thereunder. The provisions of this guaranty shall survive the Closing under the Purchase Agreement. This guaranty is binding upon the guarantor and its legal representatives, successors and assigns, and shall inure to the benefit of the Corporations and Mooney, and their respective heirs, legal representatives, successors and assigns. Guarantor waives notice of acceptance hereof.

GUARANTOR:

RADIX VENTURES, INC.

By: _____
Name:   Matthew Sheppard
Title:  Vice President/Treasurer

Dated:    July 8, 1994

36157.5

-8-

(                                              (

Exhibit C

# LEASE

THIS LEASE AGREEMENT, (hereinafter called the "Lease") dated as of the __9th day of July, 1994 by and between Flagship Properties, Inc. (hereinafter called "Lessor"), and Radix Group International, Inc., (hereinafter called "Lessee").

## WITNESSETH

The Lessor hereby leases to the Lessee and the Lessee hereby leases from the Lessor, under this Lease which shall be a triple net lease, the following described property, sometimes referred to as the Premises, demised premises or Leased Premises: (i) 15,428 square feet (being 3,728 square feet of office space and 11,700 square feet of warehouse space) located in that certain building known as 1550 NW 96th Avenue, Miami, Florida 33172 and being the entire building exclusive of approximately 1,050 square feet thereof presently occupied by American Tool Company, (ii) the land described on Exhibit A annexed hereto, being the property on which the building is situated (exclusive of first floor tenant space and parking spaces referred to below); and (iii) all parking spaces in the parking lot except for three reserved spaces for the above-referenced first floor tenant.

1. TERMS. Lessee to have and to hold above described premises for a term of 60 month(s) commencing July 9, 1994 and terminating June 30, 1999.

2. USE AND POSSESSION. It is understood that the Leased Premises are to be used for general office and warehouse purposes and for no other purpose without prior consent of Lessor. Lessee shall not use the Leased Premises for any unlawful purpose or so as to constitute a nuisance. The Lessor covenants and agrees to have the Leased Premises completed and ready for possession on or before the above commencement date. The Lessee, at the expiration of the Term, shall deliver up the Leased Premises in good repair and condition, damages beyond the control of the Lessee, reasonable use, ordinary decay, wear and tear excepted.

3. RENT. Lessee hereby covenants and agrees to pay to the Lessor together with any and all sales and use taxes levied upon the use and occupancy of the Leased Premises as set forth in Paragraph Five, an annual base rent excluding sales and/or use taxes of $97,749.96, in equal monthly installments payable in advance beginning on the Commencement Date of this Lease and on the first day of each and every month thereafter a monthly rent of $8,145.83 plus 6.5% tax in the amount of $529.48 for a total monthly payment of $8,675.31, except that the rent for the month of July 1994 shall be $5518.14 & 358.68 tax. Rent shall be paid to Lessor as follows:

Flagship Properties, Inc.
990 Hunting Lodge Drive
Miami Springs, FL 33166

Lessor may charge Lessee a late charge of 5% of the payment for each rental payment which is not received by the Lessor within ten (10) days after notice on more than one occasion per year.

## EMPLOYMENT AGREEMENT

Agreement made this 8th day of July, 1994, by and between Radix Group International, Inc., having its principal place of business at 5510 West 102nd Street, Los Angeles, California 90045 ("RGI") and Neil Mooney having an address at 990 Hunting Lodge Drive, Miami Springs, Florida 33166 ("Mooney").

## W I T N E S S E T H:

WHEREAS, contemporaneously herewith RGI is purchasing assets (subject to liabilities) from certain corporations owned by Mooney ("Mooney Affiliates") pursuant to an Asset Purchase and Sale Agreement ("Purchase Agreement") dated July 8, 1994 and entering into a Consulting Agreement ("Consulting Agreement") and a Non-Competition Agreement ("Non-Compete Agreement") with Mooney and the Mooney Affiliates of even date herewith.

WHEREAS, RGI has informed Mooney that the execution by Mooney of this Employment Agreement is a condition precedent to the consummation of the transactions set forth in the Purchase Agreement.

NOW, THEREFORE, in consideration for the payments to be made by RGI to Mooney hereunder and as a further inducement for RGI to purchase the assets of the Mooney Affiliates pursuant to the Purchase Agreement, the parties hereto agree as follows:

EXHIBIT
C

1.   <u>Employment</u>.   RGI hereby hires Mooney and Mooney hereby agrees to be employed by RGI as Vice President and shall be in charge of the Miami office of RGI for an initial period commencing on the date hereof and expiring on December 31, 1997. During his employment, Mooney will devote his full time and attention to the business of RGI and shall not conduct any other business activities of any kind, as employee, consultant, independent contractor or otherwise, except pursuant to the Consulting Agreement of even date herewith.  Mooney's activities, as an employee of RGI, will always be conducted in accordance with established RGI policies and procedures.  Mooney will be based in the Miami area unless otherwise mutually agreed.

2.   <u>Compensation</u>. As compensation hereunder, RGI agrees to pay to Mooney the following:

(a) An annual salary of Ninety-Five Thousand ($95,000) Dollars per year payable in accordance with RGI's standard salary payment schedule. The Board of Directors of RGI may determine to increase Mooney's salary and/or pay a bonus to Mooney at such time or times as it determines in its sole and absolute discretion; and

(b) In addition to the compensation set forth above, so long as Mooney is in charge of the Miami office of RGI, Mooney shall be entitled to receive:

-2-

(i)     annually, applicable to the four (4) fiscal years of RGI the first payment beginning with the fiscal year commencing August 1, 1994, within thirty (30) days after the end of the applicable fiscal year, 25% of the contribution ("Contribution") of the Miami office to the general operating profit of RGI, to the extent such Contribution exceeds Seven Hundred Fifty Thousand ($750,000) Dollars in the then applicable year. For purposes hereof, the "Contribution" of the Miami office shall be calculated in the manner currently used by RGI (i.e., the net revenues of the Miami office less its direct operating expenses, but before allocation of "Station Expenses" or "Corporate Overhead" as reflected on RGI's internal financial statements, the form of which is attached as Exhibit 1), which is consistent with Moonev Affiliates' method of calculation of "Gross Income Before Taxes") in calculating the contribution of its offices for purposes of its internal monthly reports; and

(ii)     a commission ("Additional Commission") of five (5%) percent of the net revenues (charges and disbursements invoiced, less costs and disbursements payable directly related thereto such as, but not limited to, customs duty, freight, cost of cartage, cost of bonds and insurance, exclusive of overhead calculated in a manner consistent with RGI's current calculation of "Net Fees and Commissions" as reflected on its internal financial statements, the form of which is attached as Exhibit 1) of RGI invoiced by an RGI office other than the Miami office ("Non-Miami Offices") relating to customers introduced to RGI by Mooney ("Mooney Customers"). The Additional Commission shall be payable, to the extent applicable hereunder, monthly thirty (30) days after the expiration of the applicable calendar month on all amounts invoiced by Non-Miami Offices to Mooney Customers during the term hereof. In the event, however, that any amount invoiced by a Non-Miami Office to a Mooney

-3-

Customer during such period later becomes determined to be a bad debt in accordance with the normal accounting procedures of RGI, RGI shall deduct from the next payment due to Mooney the amount of commission previously paid to Mooney in connection with such bad debt. If such invoiced account is determined to be a bad debt after expiration of the period during which the Additional Commissions are payable to Mooney hereunder, Mooney shall refund the Additional Commission paid on such amount to RGI promptly after notice thereof from RGI. Notwithstanding the above, in the event RGI later collects any bad debt charged back to Mooney, RGI shall promptly pay to Mooney the Additional Commission on such amount.

3.   **Benefits**.   During his employment, Mooney will receive all regular RGI benefit programs and be entitled to reimbursement of all expenses approved pursuant to RGI's policy for senior management personnel and an automobile allowance of $475.00 per month plus reimbursement of gasoline expenses. Mooney will have the right to participate on a contributory basis in and be covered under RGI's medical insurance plan provided that he promptly completes and files the forms required by the insurance carrier in order to initiate and maintain such coverage. Mooney acknowledges receiving under separate cover details of the above programs. Mooney shall be entitled to reimbursement of his business-related expenses in accordance with RGI's procedures and Mooney shall be entitled to travel in the same manner as other members of RGI's senior management team.

-4-

4.   <u>Confidentiality</u>. Mooney understands and agrees that all information relating to RGI and/or any of its affiliates, their services, activities, customer lists, pricing information and proprietary rights, which is not generally known to the public, including information obtained by RGI from the Mooney Affiliates or Mooney, shall be treated by him as confidential and he shall not disclose any such information to any person, firm or company. Mooney further agrees not to use or attempt to use any of such confidential information for his own purposes or for any purposes whatsoever which would not be in the best interests of RGI. No documents may be removed from RGI's offices or copied without prior approval. Any breach of the foregoing covenants of this Section will cause irreparable injury and incalculable damage to RGI and its affiliates and RGI and/or any affiliate accordingly shall be entitled to apply for and obtain injunctive relief for same in any court of competent jurisdiction in addition to all other remedies which might be available to it or them. The provisions of this Section shall survive the expiration or earlier termination of this Agreement. In the event that Mooney receives a request to disclose any confidential information under the terms of a valid and effective order issued by a court of competent jurisdiction, prior to taking any action, Mooney agrees to (i) immediately notify RGI of the existence, terms and circumstances surrounding such a request, (ii) consult RGI on the advisability of taking legally available steps to resist or narrow such request and (iii) if disclosure of such information is required, Mooney shall, at RGI's

-5-

cost, exercise Mooney's best efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the confidential information which RGI so designates.

5.  **Relocation**.  At any time after Mooney has been employed by RGI for at least three (3) years, Mooney may request transfer to another office of RGI and RGI will attempt to accommodate such request within its then existing corporate structure and business, as determined by RGI.

6.  **Insurance**.  Mooney shall cooperate with RGI to enable RGI, at its cost, to obtain a term life insurance policy on the life of Mooney for the benefit of RGI.  Provided such insurance is in effect at the time of Mooney's death, RGI shall use the proceeds thereof to prepay, to the extent of such proceeds, any remaining payments due to the Mooney Affiliates under the Consulting Agreement and Non-Compete Agreement.

7.  **Notices**.  Any notice or other communication required or desired to be given shall be in writing and shall be sent by registered or certified mail, return receipt requested.  Each such notice shall be deemed given upon deposit in any depository therefor maintained by the United States to the following respective addresses, which any party may change as to such party upon ten (10) days' notice to the other party:

-6-

JUL-07-94 THU 08:45    KHDJX CHX                    FAX NO. 3104775031              P. 04

Miami - Ocn Exp
Revenue Report
May 31, 1996

| | Month | | | Year To Date | | |
|---|---|---|---|---|---|---|
| | Actual | Budget | Prior Yr | Actual | Budget | Prior Yr |
| **Gross Revenue** | | | | | | |
| Service Fees | 3770 | 8450 | 10426 | 54200 | 76967 | 63614 |
| Consol Freight Billed | 10519 | | 856 | 19486 | | 130706 |
| Other Consolidation Revenue | | | | | | |
| IATA Commission Revenue | | | | | | |
| Agent Commission Rec'd | | | | | | |
| Bond Revenue | | | | | | |
| Insurance Revenue | | | 216 | 15118 | | 3499 |
| Cartage Revenue | 557 | | 383 | 9374 | | 15736 |
| Domestic Transp. Revenue | 222 | | 4354 | 5264 | | 15210 |
| Drawback Revenue | | | | | | |
| Disbursement Fee/Customer Interest | . | | 4 | 276 | | 22 |
| Steamship Brokerage Revenue | 1444 | | 1753 | 10051 | | 8449 |
| Currency Conversion | | | | | | 566 |
| **Total Gross Revenue** | 16520 | 8450 | 17992 | 113748 | 76967 | 237801 |
| | | | | | | |
| **Costs Against Revenue** | | | | | | |
| Costs Against Service Fees | 553 | | 2619 | 11866 | | 22576 |
| Consol Freight Cost | 8354 | | 698 | 13807 | | 108568 |
| Other Consolidation Cost | | | | 3952 | | |
| Agent Commission Cost | 1248 | | 538 | 4486 | | 13102 |
| Forwarding Commission Cost | | | | | | |
| Bond Cost | | | | | | |
| Insurance Cost | 27 | | 59 | 3818 | | 1099 |
| Cartage Cost | 435 | | 370 | 8480 | | 14905 |
| Domestic Transp. Cost | ( 18) | | 4844 | 6343 | | 15896 |
| Sales Commission | | | 67 | 504 | | 392 |
| Outlays Written Off | 75 | | | 510 | ( | 245) |
| Service Guarantee | | | | | | |
| **Total Costs Against Revenue** | 10674 | | 9195 | 53765 | | 176291 |
| **Net Fees & Commissions** | 5846 | 8450 | 8797 | 59983 | 76967 | 61510 |

```
                  ***************************
                  ***   ACTIVITY REPORT   ***
                  ***************************

    TRANSMISSION OK

    TX/RX NO.                3406
    CONNECTION TEL                    13053721352
    CONNECTION ID
    START TIME               07/07 17:40
    USAGE TIME               02'01
    PAGES                     5
    RESULT                   OK
```

# SPITZER & FELDMAN P.C.

### COUNSELLORS AT LAW

M JAMES SPITZER
RONALD J OFFENKRANTZ
LEONARD LICHTER
M. JAMES SPITZER, JR.
KENNETH GLIEDMAN
EDWIN W. WEINBERG
ROBERT G LEONARD

RITA DATTOLA
MICHAEL H. SMITH
JOSEPH J PASH, JR.

PHILIP FELDMAN 1905-1982

405 PARK AVENUE
NEW YORK, N. Y. 10022-4405

(212) 888-6680
CABLE ADDRESS "CHASTRA"
TELECOPIER (212) 838-7472

## MULTIPLE TRANSMISSION SHEET

Date: _____June 8, 1994_____                          372 - 1352

Deliver to: __Steve Oppenheim__     Fax No. _(305) ~~597-5055~~_

_____     Fax No. _____

_____     Fax No. _____

From: __Kenneth Gliedman__

Pages: _____

Client __Radix Mooney__

Message (if any):

_____

_____

_____

**This message is intended only for the use of the addressee and may contain information that is privileged and confidential.  If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone.  Thank you.**

If you do not receive all of the pages, please call James.

Our telephone number is (212) 888-6680.

28444.1

Miami
Profit & Loss Statement
May 31, 1994

| | ------------- Month ------------- | | | ----------- Year To Date ----------- | | |
|---|---|---|---|---|---|---|
| | Actual | Budget | Prior Yr | Actual | Budget | Prior Yr |
| Net Fees & Commissions | 44456 | 50416 | 52638 | 597696 | 535648 | 495158 |
| | | | | | | |
| Advertising & Promotional | | 17 | | 420 | 170 | 162 |
| Automobile Expense | 482 | 740 | 1154 | 5535 | 7400 | 7232 |
| Bad Debt Expense | | | | 4402 | 6000 ( | 17631) |
| Bank Charges | | | | | | |
| Building Expense | 527 | 780 | 583 | 8156 | 7800 | 7314 |
| Collection Expense | | 133 | | ( 2642) | 1330 | 7455 |
| Depreciation & Amortization | 1100 | 935 | 1488 | 9921 | 9350 | 14594 |
| Dues & Publications | 73 | 143 | | 1024 | 1430 | 1436 |
| Employee Relations | 359 | 371 | 288 | 2919 | 3710 | 2236 |
| Employee Agency & Ad Fees | | 50 | | 36 | 500 | 11055 |
| Equipment Rental | 43 | 145 | 485 | 4850 | 1450 | 1773 |
| Insurance - Employee Group | 2765 | 2465 | 1857 | 24373 | 24314 | 18795 |
| Insurance - Operating | 441 | 441 | 281 | 4410 | 4410 | 2810 |
| Interest Expense | 2473 | 1092 | 2171 | 22648 | 10920 | 16904 |
| Maintenance & Repair | 42 | 533 | 1314 | 3529 | 5330 | 3260 |
| Messenger Service | 865 | 1000 | 743 | 9025 | 10000 | 7703 |
| Miscellaneous Charges | | 158 | | 2088 | 1580 | 1595 |
| Outside Services | 936 | 300 | | 13014 | 3000 | 7498 |
| Payroll Taxes | 2293 | 1956 | 1486 | 20675 | 19255 | 15036 |
| Pension Plan/401k | 337 | 280 | 186 | 3021 | 2762 | 1879 |
| Photocopy | 58 | 200 | 89 | 906 | 2000 ( | 641) |
| Postage | 597 | 542 | 649 | 7155 | 5420 | 3373 |
| Rent | 5227 | 4988 | 4774 | 50601 | 50056 | 46943 |
| Salaries | 27283 | 22410 | 18034 | 241330 | 221049 | 183705 |
| Salaries - Overtime | | 600 | 538 | 1553 | 5475 | 4243 |
| Supplies | 804 | 1604 | 125 | 13764 | 16040 | 10984 |
| Telephone Expense | 1204 | 2730 | 2207 | 21121 | 27500 | 23039 |
| Training & Education | | 217 | | 59 | 2170 | 569 |
| Travel & Entertainment | 988 | 1400 | 3056 | 11744 | 14000 | 14709 |
| Utilities | 474 | 633 | 519 | 4810 | 6330 | 5228 |
| | | | | | | |
| Total Direct Oper. Exp. | 49373 | 46883 | 42027 | 490847 | 470751 | 403258 |
| | | | | | | |
| Alloc. of Station Exp. | 6449 | 6449 | 4718 | 66490 | 66490 | 47180 |
| | | | | | | |
| Contribution | ( 11366) ( | 2916) | 5893 | 42359 | 407 | 44720 |
| | | | | | | |
| Alloc. of Corp. Overhead | ( 9674) ( | 9674) ( | 10363) | ( 96740) ( | 96740) ( | 103630) |
| | | | | | | |
| Net Profit (Loss) | ( 21040) ( | 12590) ( | 4470) | ( 54381) ( | 96333) ( | 58910) |

Miami - Import
Revenue Report
May 31, 1994

| | --------------- Month --------------- | | | ------------ Year To Date ------------ | | |
|---|---|---|---|---|---|---|
| | Actual | Budget | Prior Yr | Actual | Budget | Prior Yr |
| **Gas Revenue** | | | | | | |
| Service Fees | 24644 | 20597 | 18930 | 261333 | 246581 | 219108 |
| Consol Freight Billed | 43058 | | 55297 | 483716 | | 342776 |
| Other Consolidation Revenue | 2234 | | 3430 | 33080 | | 32025 |
| IATA Commission Revenue | | | | | | |
| Agent Commission Rec'd | ( 1963) | | 1540 | ( 15263) | | 9431 |
| Bond Revenue | 4395 | | 1878 | 38388 | | 17528 |
| Insurance Revenue | | | | 42 | | 193 |
| Cartage Revenue | 7499 | | 8871 | 160731 | | 99423 |
| Domestic Transp. Revenue | 1096 | | | 7597 | | 2852 |
| Drawback Revenue | | | | | | |
| Disbursement Fee/Customer Interest | 673 | | 123 | 3496 | | 2046 |
| Steamship Brokerage Revenue | | | | | | |
| Currency Conversion | 5096 | | 154 | 12221 | | 8253 |
| Total Gross Revenue | 88532 | 20597 | 90223 | 985337 | 246581 | 733636 |
| **Costs Against Revenue** | | | | | | |
| Costs Against Service Fees | 6421 | | 618 | 57521 | | 53896 |
| Consol Freight Cost | 29966 | | 54472 | 300827 | | 340719 |
| Other Consolidation Cost | 14462 | | 3635 | 161051 | | 17202 |
| Agent Commission Cost | | | | | | |
| Forwarding Commission Cost | | | | | | |
| Bond Cost | 1191 | | 517 | 9325 | | 4945 |
| Insurance Cost | | | | 24 | | 78 |
| Cartage Cost | 5273 | | 7777 | 118896 | | 80291 |
| Domestic Transp. Cost | 941 | | | 5509 | | 2365 |
| Sales Commission | 97 | | 236 | 606 | | 922 |
| Outlays Written Off | 15419 | | 325 | 20087 | | 1715 |
| Service Guarantee | | | | | | |
| Total Costs Against Revenue | 73769 | | 67580 | 673845 | | 502133 |
| Net Fees & Commissions | 14763 | 20597 | 22644 | 311492 | 246581 | 231503 |

Miami - Air Exp
Revenue Report
May 31, 1994

| | ------------- Month ------------- | | | ----------- Year To Date ----------- | | |
| | Actual | Budget | Prior Yr | Actual | Budget | Prior Yr |
|---|---|---|---|---|---|---|
| **Gross Revenue** | | | | | | |
| Service Fees | 11396 | 21369 | 16055 | 144134 | 212100 | 144431 |
| Consol Freight Billed | 68714 | | 49372 | 570847 | | 402339 |
| Other Consolidation Revenue | | | | | | |
| IATA Commission Revenue | 6590 | | 7002 | 80066 | | 41648 |
| Agent Commission Rec'd | | | | | | |
| Bond Revenue | | | | | | |
| Insurance Revenue | 210 | | 527 | 4767 | | 5723 |
| Cartage Revenue | 466 | | 977 | 8668 | | 16009 |
| Domestic Transp. Revenue | 5492 | | 6055 | 43582 | | 38392 |
| Drawback Revenue | | | | | | |
| Disbursement Fee/Customer Interest | 190 | | 89 | 357 | | 294 |
| Steamship Brokerage Revenue | | | | | | |
| Currency Conversion | ( 5) | | 31 | 83 | | 143 |
| **Total Gross Revenue** | 93051 | 21369 | 80109 | 852502 | 212100 | 649198 |
| | | | | | | |
| **Costs Against Revenue** | | | | | | |
| Costs Against Service Fees | 7806 | | 6493 | 78257 | | 68006 |
| Consol Freight Cost | 50031 | | 42430 | 464579 | | 290322 |
| Other Consolidation Cost | | | 26 | 162 | | 56 |
| Agent Commission Cost | 4341 | | 2937 | 25607 | | 32294 |
| Forwarding Commission Cost | | | | | | |
| Bond Cost | | | | | | |
| Insurance Cost | 258 | | 254 | 3315 | | 3820 |
| Cartage Cost | 525 | | 1214 | 10284 | | 16090 |
| Domestic Transp. Cost | 4871 | | 5532 | 42447 | | 33746 |
| Sales Commission | 93 | | 25 | 102 | | 60 |
| Outlays Written Off | 1280 | | | 1530 | | 659 |
| Service Guarantee | | | | | | |
| **Total Costs Against Revenue** | 69205 | | 58911 | 626281 | | 447053 |
| **Net Fees & Commissions** | 23847 | 21369 | 21197 | 226221 | 212100 | 202145 |

(                                      (

Exhibit C

## LEASE

THIS LEASE AGREEMENT, (hereinafter called the "Lease") dated as of the __9th day of July, 1994 by and between Flagship Properties, Inc. (hereinafter called "Lessor"), and Radix Group International, Inc., (hereinafter called "Lessee").

### WITNESSETH

The Lessor hereby leases to the Lessee and the Lessee hereby leases from the Lessor, under this Lease which shall be a triple net lease, the following described property, sometimes referred to as the Premises, demised premises or Leased Premises: (i)  15,428 square feet (being 3,728 square feet of office space and 11,700 square feet of warehouse space) located in that certain building known as 1550 NW 96th Avenue, Miami, Florida 33172 and being the entire building exclusive of approximately 1,050 square feet thereof presently occupied by American Tool Company, (ii) the land described on Exhibit A annexed hereto, being the property on which the building is situated (exclusive of first floor tenant space and parking spaces referred to below); and (iii) all parking spaces in the parking lot except for three reserved spaces for the above-referenced first floor tenant.

1.   TERMS.  Lessee to have and to hold above described premises for a term of 60 month(s) commencing July 9, 1994  and terminating June 30, 1999.

2.   USE AND POSSESSION.   It is understood that the Leased Premises are to be used for general office and warehouse purposes and for no other purpose without prior consent of Lessor.  Lessee shall not use the Leased Premises for any unlawful purpose or so as to constitute a nuisance.  The Lessor covenants and agrees to have the Leased Premises completed and ready for possession on or before the above commencement date.  The Lessee, at the expiration of the Term, shall deliver up the Leased Premises in good repair and condition, damages beyond the control of the Lessee, reasonable use, ordinary decay, wear and tear excepted.

3.   RENT.  Lessee hereby covenants and agrees to pay to the Lessor together with any and all sales and use taxes levied upon the use and occupancy of the Leased Premises as set forth in Paragraph Five, an annual base rent excluding sales and/or use taxes of $97,749.96, in equal monthly installments payable in advance beginning on the Commencement Date of this Lease and on the first day of each and every month thereafter a monthly rent of $8,145.83 plus 6.5% tax in the amount of $529.48 for a total monthly payment of $8,675.31, except that the rent for the month of July 1994 shall be $5518.14 & 358.68 tax.  Rent shall be paid to Lessor as follows:

Flagship Properties, Inc.
990 Hunting Lodge Drive
Miami Springs, FL 33166

Lessor may charge Lessee a late charge of 5% of the payment for each rental payment which is not received by the Lessor within ten (10) days after notice on more than one occasion per year.

4.  RENT ADJUSTMENT.  The monthly base rent for each twelve month period, or portion of, subsequent to the first complete twelve month period occurring during the term of this Lease or any renewal thereof shall be computed by multiplying the base rent, as set forth on Paragraph Three, by a fraction whose numerator shall be the Consumer Price Index (U.S. City Average - (1967 = 100) - All Items, Bureau of Labor Statistics of the United States Department of Labor), for the month of April prior to the respective anniversary date and whose denominator shall be the Consumer Price Index (U.S. City Average - All Items) for the month of April 1994, provided that in no event shall such base rent be less than the base rent stated in Paragraph Three.  Any twelve-month period rent increase is capped at 4%.  The Lessor shall notify the Lessee of the adjusted monthly base rent, in writing, prior to the respective anniversary date if such rent adjustment occurs.  The Lessee agrees to pay the adjusted monthly rent, together with any applicable taxes as set forth in Paragraph Five, on the first day of each and every month for the following twelve month period or for those months remaining in said period after notification by Lessor.

5.  SALES AND TAX USE.  The Lessee hereby covenants and agrees to pay monthly, as additional rent, any sales, use or other tax, excluding Income Tax or similar tax, now or hereafter imposed upon rents by the United States of America, the State, or any political subdivisions thereof, to the Lessor, notwithstanding the fact that statute, ordinance or enactment imposing the same may endeavor to impose the tax to the Lessor.

6.  OPTION TO RENEW.  Lessee shall have the option to renew the lease for an additional 60-month term at the original rent plus full C.P.I. increases from the commencement date to the renewal date without regard to the cap set forth above.

7.  NOTICES.  For the purpose of demand, the respective parties shall be served by certified mail, return receipt requested, addressed to the Lessee at 745 Dillon Drive, Wood Dale, Illinois  60191-1298 with copy to Spitzer & Feldman P.C., 405 Park Avenue, New York, N.Y.  10022 Attn; K. Gleidman or to the Lessor at it's principal office address as set forth in paragraph three above.  A copy of any default notice to Lessee will be similarly sent as provided for in the previous sentence.

8.  ORDINANCES AND REGULATIONS.  The Lessee hereby covenants and agrees to comply with all the rules and regulations of the Board of Fire Underwriters, Officers or Boards of the City, County or State having jurisdiction over the Leased Premises, and with all ordinances and regulations of governmental authorities wherein the Leased Premises are located, at Lessee's sole cost and expense, but only insofar as any of such rules, ordinances, and regulations pertain to the manner in which the Lessee specifically shall use the Leased Premises; the obligation to comply in every other case, and also all cases where such rules, regulations and ordinances require repairs, alterations, changes or additions to the building (including the Leased Premises) or building equipment, or any part of either, being hereby expressly assumed by Lessor, and Lessor covenants and agrees promptly and duly to comply with such rules, regulations and ordinances with which

Lessee has not herein expressly agreed to comply. In the event of any currently existing violations of any laws, rules, or regulations, or the building structure should be in any violation of any laws, rules or regulations, then Lessor at its expense will remedy such violations. Nothing contained herein shall require Lessee to make any structural modifications, structural repairs or additions to the Leased Premises or to perform any work outside the Leased Premises.

9. APPROVAL/RIGHT OF FIRST REFUSAL. If the office space on the first a mutually agreed upon market rental rate. If Lessee chooses not to rent the space, Lessee still has the right to approve the tenant Lessor wishes to rent to, which approval will not be unreasonably withheld.

10. SERVICES AND UTILITIES. Operation and maintenance of any and all heat, ventilation, or air conditioning systems and all other services shall be the sole responsibility of Lessee and at Lessee's expense. Where applicable, all manufacturers' and builders' warranties as to the systems installed shall be used to the benefit of the Lessee.

Lessee agrees to pay or cause to be paid all charges for electricity, light, heat, power, telephone or other communication service or other utility or service rendered or supplied to, upon or in connection with the Demised Premises throughout the Lease Term, and to indemnify the Lessor and save it harmless against any liability or damages on such account.

Lessee further agrees to maintain the exterior grounds of the property.

Lessor shall be responsible for the roof and structure of the building and for reconstruction and/or repairs to the extent of insurance proceeds.

11. REAL ESTATE TAXES. Lessee is responsible for payment of 70% of the annual real property taxes for the property legally described on Exhibit "A". Lessee shall have the right to protest any taxes or increases therein in the name of Lessor at no cost to Lessor. Lessor will, however, cooperate with Lessee at no cost to Lessor. Also, Lessee shall not be liable for any increase in real estate taxes caused by an increased assessment of the property resulting from the sale of the property by Lessor.

12. ALTERATIONS. Lessee by occupancy hereunder, accepts the Leased Premises as being in good repair and condition. Lessee shall maintain Leased Premises and every part thereof in good repair and condition, damages by causes beyond the control of the Lessee, reasonable use, ordinary decay and wear and tear excepted. Lessee shall not make or suffer to be made any alterations, additions or improvements, to or of the Leased Premises or any part thereof the cost of which exceeds $1000.00, without prior written consent of Lessor, which consent the Lessor covenants and agrees shall not be unreasonably withheld. In the event Lessor consents to the proposed alterations, additions, improvements, the same shall be at Lessee's sole cost and expense the Lessee shall hold Lessor harmless on account of the cost thereof. Any such alterations shall be made at such times and in such manner to unreasonably interfere with the occupation, use and enjoyment of

3

the remainder of the building by the other tenants thereof.  If required by Lessor and agreed to by Lessee at the time the alteration was approved, such alterations shall be removed by Lessee upon the termination of or sooner expiration of the term of this Lease and Lessee shall repair damage to the Premises caused by such removal all at Lessee's cost.

13.  QUIET ENJOYMENT.  The Lessor covenants and agrees that Lessee, on paying said monthly rent and performing the covenants herein, shall and may peaceably and quietly hold and enjoy the said Leased Premises and common areas, including but not limited to parking areas, sidewalks, entrances, exits, lobbies, restrooms and lounges for term aforesaid.

14.  LESSOR'S RIGHT TO INSPECT AND DISPLAY.  The Lessor shall have the right, at reasonable times during the term of this Lease, to enter the Leased Premises for the purpose of examining or inspecting same and of making such repairs or alterations therein as the Lessor shall deem necessary, provided Landlord uses reasonable effort to ensure repairs do not interfere with Lessee's use of the Leased Premises.  The Lessor shall also have the right to enter the Leased Premises at all reasonable hours for the purpose of displaying said Premises to prospective tenants within ninety days prior to the termination of this Lease.

15.  DESTRUCTION OF PREMISES.  a. If the Leased Premises are totally destroyed by fire or other casualties, both the Lessor and Lessee shall have the option of terminating this Lease or any renewal thereof, upon giving written notice at any time within thirty days from the date of such destruction, and if the Lease be so terminated, all rent shall cease as of the date of such destruction and any prepaid rent shall be refunded.

b. If such Leased Premises are partially damaged by fire or other casualty, or totally destroyed thereby and neither party elects to terminate this Lease within the provisions of paragraph (a) above or (c) below, then the Lessor agrees, at Lessor's sole cost and expense, to restore the leased Premises to a kind and quality substantially similar to that immediately prior to such destruction or damage.  Said restoration shall be commenced within a reasonable time and completed without delay on the part of the Lessor and in any event shall be accomplished within one hundred fifty days from the date of the fire or other casualty.  In such case, all rents paid in advance shall be proportioned as of the date of damage or destruction and all rent thereafter accruing shall be equitably and proportionately suspended and adjusted according to the nature and extent of the destruction or damage, pending completion of rebuilding, restoration or repair, except that in the event of the destruction or damage is so extensive as to make it unfeasible for the Lessee to conduct Lessee's business on the Leased Premises, the rent shall be completely abated until the Leased Premise are restored by the Lessor or until the Lessee resumes use of and occupancy of the Leased Premises, whichever shall first occur.  The Lessor shall not be liable for any inconvenience or interruption of business of the lessee occasioned by fire or other casualty.

c. If the Lessor undertakes to restore, rebuild or repair the Premises, and such restoration, rebuilding or repair is not accomplished

within one hundred fifty days, and such failure does not result from causes beyond the control of Lessor, the Lessee shall have the right to terminate this Lease by written notice to the Lessor within thirty days after expiration of said one hundred fifty day period.

16.   CONDEMNATION.   If during the term of this Lease or any renewal thereof, the whole of the Leased Premises, or such portion thereof as will make the Leased Premises unusable for the purpose leased, be condemned by public authority for public use, then in either event, the term hereby granted shall cease and come to an end as of the date of the vesting of title in such public authority, or when possession is given to such public authority, whichever event last occurs.  Upon such occurrence the rent shall be returned to the Lessee.  The Lessor shall be entitled to the entire award for such taking except for any statutory claim of the Lessee for injury, damage or destruction of Lessee's business accomplished by such taking.  If a portion of the Leased Premises is taken or condemned by public authority for public use so as not to make the remaining portion of the Leased Premises unusable for the purposes leased, this Lease shall not be terminated but shall continue.  In such case, the rent shall be equitably and fairly reduced or abated for the remainder of the term in proportion to the amount of the Leased Premises taken.  In no event shall the Lessor be liable to the Lessee for any business interruption, diminution in use or for the value of any unexpired or any unexpired term of this Lease.

17.   ASSIGNMENT AND SUBLEASE.   The Lessee covenants and agrees not to encumber, mortgage, pledge or hypothecate this Lease or Leased Premises (including, but not limited to, the building, land, and leasehold improvements), or assign sublet all or any part of the Leased Premises without written consent of the Lessor, which consent the Lessor covenants and agrees shall not be unreasonably withheld. Such assignment shall in no way relieve the Lessee from any obligations hereunder for the payment of rents or the performance of the conditions, covenants and provisions of this Lease.

In no event shall Lessee assign or sublet the Leased Premises for any terms, conditions and covenants other than those contained herein.  Subject to the third paragraph of this section 17, in no event shall this Lease be assigned or be assignable by operation of law or by voluntary or involuntary bankruptcy, insolvency or reorganization proceedings.  Lessor shall not be liable nor shall the Leased Premises be subject to any mechanic's, materialman's, or other type liens caused by Lessee and Lessee shall keep the premises and property in which the Leased Premises are situated free from any such liens and shall indemnify Lessor against and satisfy any such liens which may be obtained because of acts of Lessee notwithstanding the foregoing provision.

Notwithstanding the above, Landlord may merge or consolidate or reorganize without consequence under this Lease and affiliates of Lessee may use the Premises or any portion thereof without consent of Lessor, unless the primary business of any such entity at the Premises is the storage and/or handling of perishable products or Restricted Merchandise as defined by IATA Dangerous Goods Regulations, in which event the consent of Landlord, not to be unreasonably withheld or delayed, will be required.

18. **HOLDOVER.** It is further covenanted and agreed that if the Lessee, any assignee or sublessee shall continue to occupy the Leased Premises after termination of this Lease (including a termination by notice under paragraph Twenty-five), without prior written consent of the Lessor, such tenancy shall be tenancy at sufferance. Any tenancy so created shall automatically increase the rental payable for such period to 115% of the then applicable lease rate. Acceptance by the Lessor of rent after such termination shall not constitute a renewal of this Lease or a consent to such occupancy nor shall it waive Lessor's right to reentry or any other right contained herein.

19. **SUBORDINATION.** The Lease shall be subject and subordinated at all times to the liens of any mortgages and deeds of trust in any amount or amounts whatsoever now existing or hereafter encumbering the Leased Premises, without the necessity of having further instruments executed by the Lessee to effect such subordination and Lessee covenants and agrees to execute and deliver upon demand, such further instruments evidencing such subordination of this Lease or such liens of any such mortgages or deeds of trust as may be reasonably requested by Lessor, provided that the mortgagee or holder of the deed of trust agrees that so long as the Lessee hereunder shall pay the rent reserved and comply with, abide by and discharge the terms, conditions, covenants and obligations on its part, to be kept and performed and shall attorn to any successor in title, notwithstanding the foregoing, the peaceable possession of the Lessee in and to the Leased Premises for the term of this Lease, shall not be disturbed, in the event of the foreclosure of any such mortgage or deed of trust, by the purchaser at such foreclosure sale or such purchaser's successor in title.

20. **INDEMNIFICATION.** The Lessor shall not be liable for any damage or injury or property whether it be the person or the property of the Lessee, the Lessee's employees, agents, guests, invitees or otherwise by reason of Lessee's occupancy of the Leased Premises or because of fire, flood, windstorm, Acts of God or for any other reason. The Lessee agrees to indemnify and save harmless the Lessor from and against any and all loss, damage, claim, demand, liability or expense by reason of damage to person or property which may arise as a result of the occupancy or use of said Leased Premises by the Lessee or by reason thereof or in connection therewith, or in any way arising on account of any injury or damage caused to any person or property on or in the Leased Premises providing, however, that Lessee shall not indemnify as to the loss or damage due to fault of Lessor.

21. **CONSTRUCTION OF LANGUAGE.** The terms lessee, lease agreement or agreement shall be inclusive of each other, also to include renewals, extensions or modifications of the Lease. Words of any gender used in this Lease shall be held to include any other gender and words in the singular shall be held to include the plural and the plural to include the singular, when the sense requires. The paragraph headings and titles are not a part of this Lease and shall have no effect upon the construction or interpretation of any part hereof.

22. **DEFAULT.** In the event the Lessee shall default in the payment of rent or any other sums payable by the Lessee herein, and such default shall continue for a period of ten days after notice, or if the Lessee shall

default in the performance of any other covenants or agreements of this Lease and such default shall continue for thirty days after written notice thereof (extended for a reasonable time provided Lessee promptly commences and diligently pursues the curing thereof), or if the Lessee should become bankrupt or insolvent or any debtor proceedings be taken by or against the Lessee which is not dismissed within 60 days, then the Lessor, in addition to all other legal remedies and rights of Lessor (exclusive of acceleration of rent and landlord's lien) may terminate this Lease and retake possession of the Leased Premises, or enter the Lease Premises and relet the same without termination, in which later event the Lessee covenants and agrees to pay any deficiency after Lessee is credited with the rent thereby obtained less all repairs and expenses (including the expenses of obtaining possession), or the Lessor may resort to any two or more of such remedies or rights, and adoption of one or more such remedies or rights shall not necessarily prevent the enforcement of others concurrently or thereafter.

The Lessee also covenants and agrees to pay reasonable attorney's fees and costs and expenses of the Lessor, including court costs, including at trial through appeal, if the Lessor employs an attorney to collect rent or enforce other rights of the Lessor herein in event of any breach as aforesaid and the same shall be payable regardless of whether collection or enforcement is effected by suit or otherwise. In the event of any litigation hereunder, the prevailing party shall be entitled to reimbursement of it's reasonable legal fees, costs and expenses at trial and through appeal.

23. SUCCESSORS AND ASSIGNS. This Lease shall bind and inure to the benefit of the successors, assigns, heirs, executors, administrators and legal representatives of the parties hereto.

24. NON-WAIVER. No waiver of any covenant or condition of this Lease by either party shall be deemed to imply or constitute a further waiver of the same covenant or condition or any other covenant or condition of this Lease.

25. SECURITY DEPOSIT. Lessee agrees to deposit with Lessor as security deposit an irrevocable bank letter of credit (reasonably acceptable to Lessor's counsel) in the face amount of $8,500.00 within 14 days of the execution of this Lease as security for Lessee's faithfully performance of its obligations under this Lease. Lessee shall not mortgage, assign, transfer or encumber the Security Deposit without the prior written consent of Lessor and any attempt by Lessee to do so shall be void, without force or effect and shall not be binding upon Lessor.

If Lessee fails to pay any rent or other amount when due and payable under this Lease, or fails to perform any of the terms hereof, and, in either event, fails to cure such default within the appropriate notice and grace period, Lessor may draw down against the letter of credit for rent payments or any other amount then due and unpaid, for payment of any amount for which Lessor has become obligated as a result of Lessee's default or breach, and for any loss or damage sustained by Lessor as a result of Lessee's default or breach, and Lessor may so draw down against the letter of credit without prejudice to any other remedy Lessor may have by reason of Lessee's default

or breach. If Lessor so draws down against the letter of credit, Lessee shall, within then (10) days after written demand therefor, restore the letter of credit to the full amount originally deposited; Lessee's failure to do so shall constitute an act of default hereunder and Lessor shall have the right to exercise any remedy provided for in this Agreement. Within fifteen (15) days after the Term (or any extension thereof) has expired or Lessee has vacated the Premises, whichever shall last occur, and provided Lessee is not then in default hereunder, Lessor shall return the letter of credit to Lessee, or, if Lessee has assigned its interest under this Lease, to the last assignee of Lessee. If Lessor sells its interest in the Premises, Lessor may deliver this letter of credit to the purchaser of Lessor's interest and thereupon be relieved of any further liability or obligation with respect to the letter of credit.

26. BROKER. Lessor and Lessee each covenants, warrants, and represents that no broker was instrumental in consummating this Lease, and that no conversations or negotiations were had with other brokers concerning the renting of the demised premises.

27. INSURANCE. a. All insurance required to be carried by Lessee hereunder shall be issued by responsible insurance companies reasonably acceptable to Lessor and qualified to do business in the State. Each policy shall name Lessor and at Lessor's request any mortgagee of Lessor as an additional insured, as their respective interests may appear. Each policy shall contain (i) a cross-liability endorsement, (ii) a provision that such policy and the coverage evidenced thereby shall be primary non-contributing with respect to any policies carried by Lessor and that any coverage carried by Lessor shall be excess insurance, and (iii) a waiver by the insurer of any right of subrogation against Lessor, its agents, employees and representatives which arises or might arise by reason of any payment under such policy, or by reason of any act or omission of Lessor, it's agents, employees or representatives. A copy of each paid up policy (authenticated by the insurer) or certificate of the insurer evidencing the existence and amount of each insurance policy required hereunder shall be delivered to Lessor within 10 days of the date Lessee is first given the right of possession of the Premises, and thereafter within thirty (30) days after any demand by Lessor therefor. Lessor may, at any time and from time to time, inspect and/or copy any insurance policies required to be maintained by Lessee hereunder. No such policy shall be cancelable except after thirty (30) days written notice to Lessor and Lessor's mortgage. Lessee shall furnish Lessor with renewals or "binders" of any such policy at least ten (10) days prior to the expiration thereof. Lessee agrees that if Lessee does not take out and maintain such insurance, Lessor may (but shall not be required to) procure said insurance on Lessee's behalf and charge to Lessee the premiums together with a twenty-five percent (25%) handling charge, payable upon demand. Lessee shall have the right to provide such insurance coverage pursuant to blanket policies obtained by the Lessee, provided such blanket policies expressly afford coverage to the Premises, Lessor, Lessor's mortgagee and Lessee as required by this Lease.

b. Beginning on the date Lessee is given access to the Premises for any purpose and continuing until expiration of the Term and or Lessee's vacating

of the Premises, whichever shall later occur, Lessee shall procure, pay for and maintain in effect policies of property and casualty insurance covering (i) building and all leasehold improvements (including any alterations, additions or improvements as may be made by Lessee), and (ii) trade fixtures, merchandise and other personal property from time to time in, on or about the Premises, in an amount not less than one hundred percent (100%) of their actual replacement cost from time to time, providing protection against any peril included within the classification "Fire and Extended Coverage" together with insurance against vandalism and malicious mischief.  The proceeds of such insurance shall be used for the repair or replacement of the property so insured. Upon termination of this Lease following a casualty as set forth herein, the proceeds under (i) above shall be paid to Lessor and the proceeds under (ii) above shall be paid to Lessee.  Lessor shall maintain existing insurance on the building and leasehold improvements until the Lessee obtains insurance hereunder and delivers a certificate of insurance for the appropriate coverage to Lessor at which time Lessee will reimburse Lessor for such insurance costs attributable to that period of time.

c. Beginning on the date Lessee is given access to the Premises for any purpose and continuing until expiration of the Term, and or Lessee's vacating of the Premises, whichever shall later occur, Lessee shall procure, pay for and maintain in effect worker's compensation insurance as required by law and comprehensive public liability and property damage insurance with respect to the construction of improvements on the Premises, the use, operation and condition of the Premises and the operations of Lessee in, on or about the Premises, providing personal injury and broad form property damage coverage for not less than One Million Dollars ($1,000,000.00) combined single limit for bodily injury, death and property damage liability.

28.  MISCELLANEOUS. Estoppel Certificates:  Lessee shall at any time and from time to time upon not less than ten (10) days prior written request from Lessor execute, acknowledge and deliver to Lessor, in form reasonably satisfactory to Lessor and/or Lessor's mortgagee, a written statement certifying (if true) that Lessee has accepted the Leased Premises, that this lease  is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), that the Lessor is not in default hereunder, the date to which the rental and other charges have been paid in advance, if any, and such other accurate certification a s may reasonably be required by Lessor or Lessor's mortgagee, and agreeing to give copies to any mortgagee of Lessor of all notices by Lessee to Lessor.  It is intended that any such statement delivered pursuant to this subsection may be relied upon by the prospective purchaser or mortgagee of the leased premises of real estate and their respective successors and assigns.  At Lessee's request, Lessor shall from time to time deliver a similar estoppel certificate to Lessee.

29.  ZONING.  Lessee understands and acknowledges that the leased premises are zoned IU-C (Dade County zoning classification).  Lessee shall comply with all provisions of said code and specifically understands that it is the responsibility of the Lessee to obtain an Occupational License and a Business Certificate use of Occupancy promptly after taking possession of the Premises.

30.   ACCEPTANCE OF PREMISES.   No promise of the Lessor to alter, remodel, or improve the Demised Premises and no representation respecting the condition of the Demised Premises have been made by the Lessor to the Lessee, unless the same is contained herein or made a part hereof and Lessee will make no claim on account of any representations whatsoever, whether made by any renting agent, broker, officer or other representative of Lessor or which may be contained in any circular, prospectus or advertisement relating to the Demised Premises, unless the same is specifically set forth in this Lease.

IN WITNESS WHEREOF, Lessee and Lessor have caused this instrument to be executed as of the date first written, by their respective officers or parties thereunder duly authorized.

Signed and Sealed in the
Presence of:

WITNESSES:

_____

_____

_____

_____

LESSEE:   Radix Group International, Inc.

By: _____
    DON FRIEDKIN, SEC'Y

Date: _____

LESSOR:   Flagship Properties, Inc.

By: _____

Date: _____

EXHIBIT "A"

Lot 25 in Block 1, FINGERLAKES COMMERCENTER, Plat Book 114, Page 16, Dade County, Florida.



Note: First floor entry area and warehouse section of Leased Premises not included within above diagram.

8